799 So.2d 188 (2001)
WAL-MART STORES, INC.
v.
Sara KENNEDY.
Sara Kennedy
v.
Wal-Mart Stores, Inc.
2990722.
Court of Civil Appeals of Alabama.
May 4, 2001.
*190 Charles F. Carr and Joseph H. Driver of Carr, Allison, Pugh, Howard, Oliver & Sisson, P.C., Birmingham, for appellant/cross appellee Wal-Mart Stores, Inc.
Jimmy S. Calton, Sr., of Calton & Calton, Eufaula, for appellee/cross appellant Sara Kennedy.
*191 YATES, Presiding Judge.
Sara Kennedy sued her employer, Wal-Mart Stores, Inc., on November 18, 1998, seeking to recover workers' compensation benefits for injuries she had sustained during the course of her employment with Wal-Mart. On the date that the case was tried, Kennedy, pursuant to § 25-5-59(b), Ala.Code 1975, petitioned the court to assess a 15% penalty on the amount of compensation that she alleged was due from April 21, 1997, until the date of trial. Kennedy also asked the court to assess the penalty on the amount of temporary-total-disability benefits she claimed she had been underpaid. Following an ore tenus proceeding, the trial court, on February 29, 2000, entered an order finding, among other things, that Kennedy's average weekly wage had been $247.99; that she had suffered injuries to her right and left hips and, as a result of those injuries, had developed carpal tunnel syndrome in her left wrist; and that she had been rendered permanently and totally disabled as a result of her injuries. The court awarded benefits accordingly. The court denied Kennedy's petition to assess the 15% penalty. Wal-Mart appeals. Kennedy cross-appeals.
This case is governed by the 1992 Workers' Compensation Act. This Act provides that this court's review of "the standard of proof ... and other legal issues ... shall be without a presumption of correctness." § 25-5-81(e)(1), Ala.Code 1975. It further provides that when this court reviews a trial court's "findings of fact," those findings "shall not be reversed if [they are] supported by substantial evidence." § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996), quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).
Kennedy was employed by Wal-Mart in December 1995. On March 21, 1997, while working as a cashier and greeter, she slipped in some Pine-Sol (a cleaning solution) that had been spilled near one of the cash registers. Kennedy did not fall, but she stated, "[M]y left foot shot out from under me, and I would have done a whole split if I hadn't caught ahold of the side of the cash register." Kennedy testified that after the accident she experienced pain in her right arm, her right hip and buttocks area, and her left groin. Kennedy reported the accident to the store manager and then went home.
Kennedy returned to work the following day, but she was in a great deal of pain. Kennedy was initially treated by Dr. Gertrude E. Nixon, the company physician, on March 26, 1997. Dr. Nixon's examination revealed that Kennedy was "tender in her right hip-bi-lateral in her groin-with a painful range of motion." X-rays were negative for a fracture. Dr. Nixon's diagnosis at that time was a right-hip contusion. Kennedy was seen by Dr. Nixon again on April 7, 1997. Dr. Nixon's examination at that time revealed that Kennedy was very tender in her groin, with a limited range of motion and painful ambulation. Dr. Nixon's diagnosis on that day was right-hip contusion and a left-groin strain. Dr. Nixon referred Kennedy to Dr. Francis Moll for an orthopedic consultation.
Kennedy was first seen by Dr. Moll on April 9, 1997, complaining of pain in her *192 left-groin area at that time. Dr. Moll noted that she did not complain of pain in her right-groin or right-hip area. Dr. Moll's physical examination indicated that upon manipulation she was experiencing pain in her left-groin but no pain in her right-groin. Dr. Moll placed Kennedy on a walker on April 11, 1997. An MRI revealed that Kennedy had bilateral avascular necrosis of the femoral heads in both the right and left hip. Avascular necrosis is a condition that affects the blood supply to the ball of the hip joint. The condition causes hip pain similar to arthritic pain, although it can be more severe. The MRI also revealed a fracture of the left femoral head. Dr. Moll stated that there was no doubt Kennedy sustained the fracture when she had the accident at work. Dr. Moll informed Kennedy that the treatment for her injury was a total hip arthroplasty and that some day her right hip would probably also fail and require a replacement. Dr. Moll noted that Kennedy was in a great deal of pain and that the pain was legitimate hip pain. Dr. Moll referred Kennedy to Dr. Paul Maddox, an orthopedic surgeon.
Kennedy was initially seen by Dr. Maddox in June 1997, complaining of left-hip pain. Dr. Maddox noted the earlier MRI indicating the presence of avascular necrosis and the fracture in the left femoral head. Dr. Maddox's examination indicated that Kennedy could not lift her left leg against gravity and that any passive movement of the left hip was extremely painful. He noted that Kennedy's condition had not improved since she had been placed on a walker by Dr. Moll in April, and he concluded that Kennedy needed a hip replacement. Dr. Maddox noted that Kennedy had had no symptoms with her hip before she had the accident at work. Dr. Maddox testified that the accident described by Kennedy at work would cause a fracture in someone suffering from avascular necrosis in the hip.
On June 11, 1997, Dr. Maddox performed surgery and placed a unipolar prosthesis in her left hip, which is the replacement of the ball of the hip. Following the surgery, Kennedy continued using the walker and began a program of rehabilitative therapy. Dr. Maddox informed Kennedy that she could start bearing weight on her left hip at about six to eight weeks following the surgery. Kennedy returned to Dr. Maddox on August 20, 1997, and he noted at that time that she was still walking with a limp but that she was no longer using the walker and was "full-weight-bearing" on her left hip with a cane.
While using the walker and cane during the course of her recovery from the hip surgery, Kennedy developed carpal tunnel syndrome in her left hand. Dr. Maddox performed a carpal tunnel release to correct the problem. Kennedy testified that she had had carpal tunnel syndrome approximately 15 years before the accident at Wal-Mart and that she had undergone carpal tunnel surgery at that time. Kennedy stated that before the accident at Wal-Mart she could lift with her left hand as well as she could with her right hand and that she first started experiencing problems with her left hand while recuperating from the hip surgery.
Kennedy continued to be treated by Dr. Maddox for her left-hip pain. Dr. Maddox noted in February 1998 that Kennedy was walking very poorly and that her limp was more severe. Kennedy had attempted to return to work but was unsuccessful. Dr. Maddox continued Kennedy in physical therapy, and her condition improved. Dr. Maddox noted that in June 1998 Kennedy was working approximately 30 hours per week; however, in July 1998 her condition deteriorated. Dr. Maddox noted at that *193 time that she was experiencing an increase in her hip pain and was limping more. Dr. Maddox ultimately concluded that a total hip arthroplasty was necessary, and he performed the surgery on August 21, 1998.
Kennedy was seen by Dr. Maddox on September 24, 1998. He noted at that time that she was healing well with weight bearing on her left hip and that her condition was improving. Kennedy was seen again by Dr. Maddox on October 16, 1998, noting at that time that she had done well with the left-hip replacement; however, during the rehabilitation period from her left-hip replacement, she began to have progressive collapse with increasing pain and dysfunction in her right hip. Dr. Maddox eventually performed a total hip arthroplasty of Kennedy's right hip.
Dr. Maddox testified that the avascular necrosis that Kennedy suffered from was present before her accident at Wal-Mart. He stated that approximately 90% of the people with the condition ultimately require a hip replacement and that it was his opinion that Kennedy would have eventually needed hip replacement surgery whether or not she had the accident at Wal-Mart.
The evidence also indicates that Kennedy was treated by Dr. R. Bruce Hall in 1991 for complaints of pain in her lower-right back, right hip, and right leg. An MRI revealed that Kennedy had some spinal stenosis at the L3-4 vertebrae. Dr. Hall treated Kennedy with a series of epidural injections. Dr. Maddox testified that the spinal stenosis was not related to Kennedy's accident at Wal-Mart.
Dr. Maddox testified that if Kennedy was not being seen by physicians, was not complaining of hip pain, and was not limping before her accident at Wal-Mart, then he would conclude that she was functioning well with her underlying avascular necrosis condition. He further testified that the fact that she had not missed any work was compelling evidence that she was functioning well with the condition.
When asked if Kennedy's need for a right-hip replacement was related to her accident at Wal-Mart, Dr. Maddox replied:
"A. That is a bit of a stretch. I think in the sense that you suggested that if she had this underlying disorder of avascular necrosis and she never had a left hip replacement, and never had pain on the left hip, and never had a prolonged period of limping where she would have had to have thrown most of her weight on the right hip, then maybe the right hip would not have become the problem that it was, collapse as much as it did or require the surgery. Maybe. It certainly could have contributed to the ultimate need for a right hip replacement. It is possible with this disease and no fall, ever, that this patient could have come to bilateral polar hip replacement. That has to be understood. But her history I believe was clear about the fall exacerbat[ing] acute pain, and unless there is something in her old record about chronic left hip pain prior to the fall, then I assume that she was not having symptoms before she had that fall."
(Emphasis added.) Dr. Maddox testified that he could not state with a reasonable degree of medical certainty that the right-hip replacement was caused by Kennedy's accident at Wal-Mart. However, he did state that "it is reasonable [that] there was a contribution to this cascade [of symptoms] from the fall based on [her] history."

The Average Weekly Wage
Wal-Mart initially argues that the trial court erred in determining that Kennedy's average weekly wage was $247.99. We *194 agree. Section 25-5-57(b), Ala.Code 1975 provides:
"(b) ... Average weekly earnings shall be based on the wages, as defined in Section 25-5-1(6) of the injured employee in the employment in which he or she was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury divided by 52, but if the injured employee lost more than seven consecutive calendar days during the period, although not in the same week, then the earnings for the remainder of the 52 weeks shall be divided by the number of weeks remaining after the time so lost has been deducted."
Section 25-5-1 provides: "Average weekly earnings shall not include fringe benefits if and only if the employer continues the benefits during the period of time for which compensation is paid. `Fringe benefits' shall mean only the employer's portion of health, life, and disability insurance premiums."
An earnings history report generated by Wal-Mart indicates that Kennedy earned $11,379.05 in gross income during the 52 weeks preceding March 14, 1997.[1] This sum includes $442.46 of vacation pay received on March 14, 1997. According to the earnings report, Kennedy missed seven consecutive calendar days on two occasions during the pay period beginning May 10, 1996, and ending May 24, 1996. Kennedy testified that she had missed work because she had to care for her husband, who had had a heart attack.
In response to an interrogatory propounded by Kennedy, Wal-Mart indicated that in 1996 it paid $21.50 per week for medical insurance and $.34 per week for life insurance. In 1997 it paid $15.50 per week for medical insurance and $.34 per week for life insurance. The total amount paid by Wal-Mart for medical insurance during the relevant 52-week period is $1,003. The total amount paid by Wal-Mart for life insurance during the relevant period is $17.68. Thus, the total amount of fringe benefits paid by Wal-Mart during the relevant period is $1,020.68.
Kennedy testified at trial that as far as she knew she was still employed by Wal-Mart and that she was still paying for her portion of the group insurance. Byron Butterfield, the store manager, testified that Wal-Mart was still paying its share of Kennedy's group-insurance premium. Because Wal-Mart was continuing to pay Kennedy's fringe benefits during the period in which it was paying compensation, those benefits are not to be included in calculating Kennedy's average weekly wage. Therefore, in order to determine Kennedy's average weekly wage, $11,379.05 (the gross income over the relevant 52-week period) is divided by 50 weeks (given that she was out two weeks caring for her sick husband), for an average weekly wage of $227.58.
Accordingly, that portion of the trial court's order finding that Kennedy's average weekly wage was $247.99 is reversed. Upon remand, the trial court is to calculate any benefits to which Kennedy is entitled by using an average weekly wage of $227.58.

The Right-Hip Injury
Wal-Mart argues that Kennedy's right-hip injury was not related to her accident at Wal-Mart. The trial court concluded that Kennedy's right-hip injury was a "successive compensable injury" as defined by our supreme court in Ex parte Pike County *195 Comm'n, 740 So.2d 1080 (Ala.1999). In Pike County Comm'n, the employee first complained of, and was treated for, back pain in October 1991, after stepping from a tractor at work. The employee was again treated for back pain in May 1993, after slipping from a front-end loader while at work. In November 1994 the employee was again treated for back pain after lifting a piece of pipe at work. The employee returned to his physician in May 1995, complaining of abdominal pain that he had experienced after lifting some blocks. The employee returned to his physician again in September 1995, complaining of back and abdominal pain that occurred after he had lifted his 12-pound baby. A CAT scan revealed that the employee had a herniated disc. Id.
In affirming the trial court's award of benefits to the employee, our supreme court relied upon the "successive-compensable-injury" test. The court stated:
"When determining whether a successive injury is compensable, the general rule is that `[w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to [the] claimant's own intentional conduct.' [1 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law, § 13.00. (1998)] ... Thus, `a subsequent injury, whether an aggravation of an original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.' 1 Larson, supra, § 13.11."
Id., at 1084.
For the left-hip injury to be compensable, it must have been "caused by an accident arising out of and in the course of" the employee's employment. § 25-5-51, Ala.Code 1975. The phrase "arising out of" requires a causal connection between the injury and the employment. Dunlop Tire & Rubber Co. v. Pettus, 623 So.2d 313 (Ala.Civ.App.1993). The phrase "in the course of" refers to the time, place, and circumstances under which the accident occurred. Id. In accident cases, i.e., those involving a sudden and traumatic event, an employee must produce substantial evidence tending to show that the alleged accident occurred and must also establish medical causation by showing that the accident caused, or was a contributing cause of, the injury. Trinity Indus., Inc., 680 So.2d at 266 n. 3. The trial court may find medical causation without testimony from medical doctors. Ex parte Price, 555 So.2d 1060 (Ala.1989). The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, A Div. of USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ. App.1993). It is clear from a review of the record in this case that the left-hip injury was a compensable injury.
We must next determine whether the right-hip injury was a compensable injury, i.e., whether "it [was] the direct and natural result" of the left-hip injury. Pike County Comm'n, 740 So.2d at 1084. We note that Kennedy's underlying avascular necrosis does not disqualify her from receiving workers' compensation benefits. "It is well settled that no preexisting condition is deemed to exist for the purposes of a workers' compensation award if the employee was able to perform the duties of his job prior to the subject injury." Taylor v. Mobile Pulley & Mach. Works, 714 So.2d 300, 302 (Ala.Civ.App.1997). This court has stated:
"`If the employee was able to perform his duties prior to the injury, no preexisting condition is present for [the] purpose of [workers'] compensation. If a *196 job related injury combines with a preexisting condition to produce a disability, it does not affect a compensation award. Further, if a preexisting condition is aggravated by a work-related injury, the condition is still compensable even though the accident may not have caused the same injury in a normal person.'"
Id., at 302, quoting G.C. Colyer & Co. v. McAdams, 562 So.2d 1326, 1328-29 (Ala. Civ.App.1990) (citations omitted).
The record indicates that Kennedy was able to perform all the duties required by her employment at Wal-Mart and had missed no time from work before the accident of March 21, 1997. Dr. Maddox stated that this was compelling evidence that Kennedy was functioning well with her condition. Kennedy's left hip became symptomatic following the accident at Wal-Mart, and she eventually had to have a total left-hip replacement. Following the accident at Wal-Mart, Kennedy went through an extended period when she walked with a limp and could not bear weight on her left hip and was transferring weight to her right hip. Following the left-hip replacement surgery, Kennedy went through a rehabilitative period when she was again unable to bear weight on her left hip and was transferring weight to her right hip. It was during this rehabilitative period that Dr. Maddox noted that Kennedy was having progressive collapse with increasing pain and dysfunction in her right hip.
Dr. Maddox testified that Kennedy's problem in her left hip, which resulted in the left-hip replacement, and the prolonged period of limping and transferring weight to her right hip "certainly could have contributed to the ultimate need for a right hip replacement." Although Dr. Maddox testified that he could not state with a reasonable degree of medical certainty that Kennedy's right-hip replacement was caused by her accident at Wal-Mart, he did state that it was reasonable to conclude that it contributed to Kennedy's "cascade of symptoms." We note that it is not required that the accident be the sole cause of the injury for which benefits are sought, so long as it is at least a contributing cause. Trinity Indus., Inc., supra.
We conclude that the court had before it substantial evidence to support a finding that Kennedy's right-hip injury, which resulted in a total hip replacement, was the natural and direct result of her left-hip injury that arose out of and in the course of her employment with Wal-Mart. Accordingly, the trial court's finding that Kennedy's right-hip injury was a compensable injury is due to be affirmed.

The Carpal Tunnel Injury
Wal-Mart next argues that Kennedy failed to prove by clear and convincing evidence that her carpal tunnel injury was related to her accident at Wal-Mart. The same legal analysis used to determine whether the right-hip injury was related to Kennedy's accident at Wal-Mart, and therefore was compensable, is also applicable to determine whether the carpal tunnel injury is compensable. We therefore will not restate those principles of law.
We do note, however, that injuries, such as carpal tunnel syndrome, that result from "gradual deterioration or cumulative physical stress disorders ... shall be deemed compensable only upon a finding of clear and convincing proof that those injuries arose out of and in the course of the employee's employment." § 25-5-81(c), Ala.Code 1975. Section 25-5-81(c) provides:
"`[C]lear and convincing' shall mean evidence that, when weighted against evidence in opposition, will produce in the *197 mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
The evidence indicates that Kennedy had had carpal tunnel syndrome approximately 15 years before her accident at Wal-Mart and had surgery to correct the problem. Kennedy testified that before the accident she was able to lift objects with her left hand as well as she was with her right hand. There is no indication in the record that Kennedy complained of symptoms in her left hand or missed any time from work due to her left hand before the accident at Wal-Mart. Dr. Maddox testified as follows with regard to Kennedy's carpal tunnel syndrome:
"Q. Did she continue throughout your rehabilitative treatment to have pain in this particular area of the body?
"A. Even as late as 9/20, which is three months out, we felt that she was having a significant limp. Our notes don't indicate how much pain she was having, but during the process of her walking and using a cane and a walker she developed some carpal tunnel symptoms and ended up having to have a carpal tunnel release. That is a pinched nerve in the palm of her hand. That sort of slowed her progress.
"Q. Was the carpal tunnel related to the accident in the sense that it developed as a result of her having to use the tremendous pressure on the walker trying to walk around?
"A. I can't say that with absolute certainty, but I believe since she had not complained of carpal tunnel symptoms before, and she was relegated to a walker or cane, and then developed the symptoms, that probably contributed to her carpal tunnelI mean, for that surgery. It was combined with a [three month] period of either using a walker or cane."
(Emphasis added.) We conclude that Kennedy established by clear and convincing proof that the carpal tunnel syndrome was a direct and natural result of her left-hip injury, which arose out of, and in the course of, her employment. Pike County Comm'n, supra. Dr. Maddox stated that he could not state with absolute certainty that Kennedy's carpal tunnel problem resulted from her workplace accident; however, § 25-5-81(c) does not require proof to an absolute certainty, but, rather, requires only clear and convincing proof. Dr. Maddox's testimony met that standard. Accordingly, the trial court's finding that Kennedy's carpal tunnel injury was a compensable injury is due to be affirmed.

Permanent Total Disability
Wal-Mart next argues that the trial court erred in finding Kennedy permanently and totally disabled. The trial court made the following findings with regard to disability:
"That from the testimony and evidence herein, the court finds that the Plaintiff is and has been since said accident and injury totally disabled and that she will continue to be permanently totally disabled and totally impaired in her ability to earn a living. The court further finds that Plaintiff is presently entitled to Workers' Compensation benefits for total permanent disability and total permanent impairment of wage earning ability since March 21, 1997. The court observed the Plaintiff slowly move in and around the courtroom with the aid of a walker and saw her expression of *198 pain and discomfort. The court finds that the Plaintiff is in constant pain and discomfort. The court further finds that the Plaintiff is unable to work at her job held before the accident and due to her limited education, her advanced age, her constant pain, her lack of mobility, her lack of grip in her left hand, and weakness in her left arm, that she is incapable of returning to her previous employment or of being retrained."
We note that we apply a presumption of correctness to the court's findings of fact, including its determination of disability. Where ore tenus evidence is presented to the trial court, the court's findings of fact based on that evidence are presumed correct and will not be disturbed on appeal unless they are clearly erroneous and without supporting evidence. Mutual Sav. Life Ins. Co. v. Hogue, 693 So.2d 530 (Ala.Civ.App.1997). The test for permanent total disability is the inability to perform one's trade and to find gainful employment. Michelin N. Am., Inc. v. Hamby, 722 So.2d 770 (Ala.Civ.App.1998). The court must apply a two-pronged test in determining whether a permanent total disability exists: the employee must be found to be incapable of returning to his trade, as well as incapable of being retrained for gainful employment. Id. "Total disability does not mean an entire physical disability or absolute helplessness." Id., at 773. The court is not required to make a specific finding that an employee cannot be retrained for gainful employment, because such a finding is implicit when the trial court concludes that the employee is permanently and totally disabled. Star Rails, Inc. v. May, 709 So.2d 44 (Ala.Civ.App.1997). "`[G]ainful employment means employment similar in remuneration to that earned prior to the injury. Implicit in this is that the gainful employment sought to be restored must be `suitable.' By `suitable' we mean employment which is compatible with the employee's preinjury occupation, age, education, and aptitude.'" Trans Mart, Inc. v. Brewer, 630 So.2d 469, 471 (Ala.Civ.App.1993), quoting Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985). It is the duty of the trial court to make some determination as to the extent of disability. Hamby, 722 So.2d at 773. In making this determination, the trial court is not bound by expert testimony, but must consider all the evidence, including its own observations, and interpret it to its own best judgment. Burden v. Huckaba, 708 So.2d 199 (Ala. Civ.App.1997). The court may also consider the employee's own subjective complaints of pain in determining disability. Hamby, 722 So.2d at 773.
At the time of trial, Kennedy was 68 years old. She had a ninth-grade education. She had not obtained a GED certificate and had had no technical training of any kind. Kennedy's prior employment had consisted primarily of working in an unskilled position in a sewing factory and of working at various cashier jobs. Kennedy was employed at Wal-Mart as a cashier and a part-time greeter. Her job duties required her to stand for long periods and occasionally to lift cases of drinks and 50 pound bags of dog food.
Kennedy testified that she was still receiving treatment for her left hip and that she was still using a walker. Kennedy stated that she cannot sit or stand for extended periods and that her hip will occasionally give way with her while she is walking. Kennedy testified that she can no longer grip or lift heavy items with her left hand and that her left hand is going to require more surgery. Kennedy further stated that she could no longer perform certain household activities such as cleaning, vacuuming, sweeping, dusting, cooking, and doing the laundry.
*199 Dr. Maddox testified that Kennedy could return to sedentary-to-light work duty with no repetitive bending, lifting, climbing, or carrying of items. Dr. Maddox stated that Kennedy's current complaints with her left hip are most likely related to the spinal stenosis that she had previously been diagnosed with. Butterfield testified that a position as a fitting room attendant was available to Kennedy and that this position would fall within the restrictions outlined by Dr. Maddox. Butterfield, however, on cross-examination stated that he thought Kennedy would not be able to satisfy the customers' needs in that position, based on the testimony regarding her current condition.
After carefully reviewing the record, we cannot say the trial court erred in finding Kennedy to be permanently and totally disabled.

The Cross Appeal
Kennedy argues that the trial court erred in failing to award a 15% penalty on the temporary-total-disability benefits she was underpaid. Wal-Mart paid temporary-total-disability benefits based on an average weekly wage of $173.60, through April 30, 1999. Kennedy contends that the average weekly wage of $173.60 was far below her true average weekly wage and was arrived at with no apparent justification; therefore, she argues that she is entitled to the 15% penalty on the amount of benefits that she was underpaid.
Section 25-5-59(b), Ala.Code 1975, provides: "If any installment of compensation payable is not paid without good cause within 30 days after it becomes due, there shall be added to the unpaid installment an amount equal to 15 percent thereof, which shall be paid at the same time as, but in addition to, the installment." (Emphasis added.) In denying the 15% penalty on the underpaid benefits, the trial court noted that no authority exists for assessing the penalty on underpaid benefits as opposed to unpaid benefits; however, the trial court invited this court to review the circumstances of this case to determine whether the current law should be expanded in order to permit a trial court to assess the penalty in circumstances where benefits are underpaid with no apparent justification. We note that the plain language of § 25-5-59(b) contemplates the assessment of the penalty on unpaid benefits only and does not address the underpayment of benefits. Our supreme court has stated:
"`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"
Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293, 296 (Ala.1998), quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala. 1992). Accordingly, we must construe § 25-5-59(b) to provide for the assessment of the 15% penalty only on unpaid installments of benefits and not on underpaid installments of benefits. Although this court understands the trial court's concern, that concern is based on an issue properly to be addressed by the Legislature.
Kennedy next argues that the trial court erred in determining that a good-faith dispute existed as to the compensability of the right-hip and carpal tunnel injuries and thereby erred in not assessing the 15% penalty on benefits owed after April 30, 1999. As noted above, the penalty is added to any unpaid installment of benefits only upon a showing that that installment *200 "is not paid without good cause within 30 days after it becomes due." § 25-5-59(b), Ala.Code 1975. After reviewing the record, we conclude that there was a good-faith dispute on the part of Wal-Mart as to the compensability of the right-hip and carpal tunnel injuries and, therefore, that the trial court properly denied the 15% penalty provided for by § 25-5-59(b). That denial is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
MURDOCK, J., concurs in part and dissents in part.
MURDOCK, Judge, concurring in part and dissenting in part.
The trial court concluded that Kennedy's workers' compensation benefits should have been based upon an average weekly wage of $247.99. The majority concludes that the trial court erred to reversal in not calculating the employee's benefit based on an average weekly wage of $227.58. Because § 25-5-1, Ala.Code 1975, defines "average weekly earnings" as not including fringe benefits if the employer continues the benefits during the period of time for which compensation is paid, I agree with the conclusion reached by the majority with respect to the benefits applicable to the period before the trial court's judgment. For the same reason, however, I cannot conclude that this error by the trial court extends to its award of benefits to be paid after the judgment. I therefore would affirm the trial court's calculation of future benefits based upon an average weekly wage of $247.99, and I respectfully dissent from the majority's opinion holding otherwise.
With respect to the penalty issue raised by Kennedy in her cross-appeal, § 25-5-59(b), Ala.Code 1975, provides in relevant part that "[i]f any installment of compensation payable is not paid without good cause within 30 days after it becomes due, there shall be added to the unpaid installment an amount equal to 15 percent thereof." While I certainly agree with the majority that, "[i]f the language of a statute is unambiguous ... the clearly expressed intent of the legislature must be given effect," Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)), I do not think that that principle supports the majority's application of this statute.
Through April 30, 1999, Kennedy should have received a benefit of $151.72 each week, based on an average weekly wage of $227.58. Instead, she received only $115.74. Thus, an "installment of compensation payable" in the amount of $35.58 was not paid each week. In my opinion, therefore, subject to the "good-faith" exception discussed below, § 25-5-59(b) was implicated. A contrary holding would enable employers to delay payment of full benefits by making payments of less than is actually owed, without penalty.[2]
In cases where there has been a reasonable factual or legal justification for contesting *201 the employee's entitlement to benefits, however, this court has held that a "good-faith" failure to pay such benefits does not trigger the penalty provided by § 25-5-59(b) in light of the "without-goodcause" requirement in the section. See Stevison v. Qualified Personnel, Inc., 571 So.2d 1178 (Ala.Civ.App.1990); Crown Textile Co. v. Dial, 507 So.2d 522 (Ala.Civ. App.1987); Read News Agency, Inc. v. Moman, 383 So.2d 840 (Ala.Civ.App.1980).
In the present case, the trial court noted evidence that could support the conclusion that there was a good-faith dispute by the parties as to whether the employee should have been paid a benefit based upon an average weekly wage of $247.99 or $223.30, or some amount in between. There is little or no evidence in the record, however, indicating that this dispute extended in good faith, or for good cause, to a weekly-wage calculation much below these amounts. In its judgment, the trial court stated, in part:
"The court agrees with the Plaintiff that it is highly questionable whether or not the facts of this case rise to the level of a `good faith dispute' between the parties as opposed to total indifference or gross negligence on the part of the Defendant in not ascertaining the correct average weekly wage. The Defendant's first report of injury to the State Workers' Compensation Board showed an average weekly benefit of $247.00 which translates into a weekly benefit of $164.65. Without explanation, the Defendant paid benefits from March 21, 1997, until April 30, 1999, based on an average weekly wage of $173.60 per week for a weekly benefit of $115.74. At trial, the Defendant sought to prove that the Plaintiff's average weekly wage was $223.30 for a $148.86 weekly benefit. All figures before the court were furnished by and came from Defendant's records. Defendant answered as part of discovery, interrogatories setting forth an average weekly earning of $225.34 without including fringe benefits.... When the figures set forth in its answer are used, an average weekly wage of $247.99 is obtained. No explanation was ever offered by the Defendant to explain the discrepancy between what was owed weekly and what was actually paid weekly."
The employee proved that, for the period prior to and including April 30, 1999, she was entitled to a benefit payment based upon an average weekly wage of $227.58. The employer provided no reasonable factual or legal explanation indeed, the employer provided no explanationas to why it based its benefit payments on an average weekly wage of $173.60, resulting in a benefit payment of $115.74. I therefore would reverse the trial court's holding insofar as it failed to apply the 15% penalty of § 25-5-59(b) to the difference between $115.74, the benefit actually paid for the period prior to and including April 30, 1999, and the lowest benefit that the employer could have paid consistent with the "good-cause"/good-faith requirement of § 25-5-59(b). Accordingly, I respectfully dissent from that portion of the majority opinion affirming the trial court's failure, despite its findings quoted above, to apply such penalty. I would remand for further proceedings consistent with this special opinion.
I otherwise concur with the majority opinion.
NOTES
[1] The date of Kennedy's injury fell in the middle of a pay period, so an exact dollar amount is difficult to ascertain. However, both parties use March 14, 1997, as a starting point for the purposes of calculating her average weekly wage.
[2] Logically, if only the complete failure to make any payment under the Workers' Compensation Act were to trigger the penalty provisions of Section 25-5-59(b), then an employer, without good cause for doing so, could make a weekly benefit payment of only $1.00, and thereby avoid the penalty. Such a result would defeat the very purpose for which the legislature enacted the statute. See generally Alidor v. Mobile County Comm'n, 291 Ala. 552, 284 So.2d 257 (1973) ("Courts will attempt to give meaning to a legislative enactment and it is presumed that the Legislature did not do a vain and useless thing.").