[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 994 
Royce Snell sued his employer, Goodyear Tire Rubber Company, on April 7, 1999, seeking to recover workers' compensation benefits for injuries he had sustained to his lower back on October 2, 1996; to his right knee on April 17, 1997; and to his neck on November 17, 1998, all during the course of his employment with Goodyear.
Following an ore tenus proceeding, the trial court, on June 27, 2000, entered an order finding that Snell had suffered an injury to his lower back during the course of his employment with Goodyear and that as a result he had suffered a 100% loss of ability to earn and was permanently and totally disabled. The court awarded benefits accordingly. Goodyear appeals, *Page 995 
following the denial of its postjudgment motion.[1]
This case is governed by the 1992 Workers' Compensation Act. This Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262,268 (Ala. 1996), quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012,1014 (Ala.Civ.App. 1995).
Snell was 43 years old at the time of trial and had been employed with Goodyear for 21 years. He had graduated from high school and had two years of technical training in cabinetmaking, although he had never been employed in that vocation. In 1989, Snell suffered an injury to his lower back at the L5-S1 level on the right side, during the course of his employment with Goodyear. He underwent surgery to repair the injury. He was returned to work at full duty with a 13% permanent medical impairment and a lifting restriction of 50 pounds. Snell had no more problems with his back following this 1989 injury and was able to perform the full duties of his job on the "paint and sort" line, where he sorted tires weighing approximately 25 to 45 pounds.
Snell testified that he injured his lower back again, on October 2, 1996, while working for Goodyear. He stated that he first saw the company physician, who prescribed pain medication and muscle relaxers and returned Snell to work. He testified that he returned to his normal duties and continued to work, but did so with pain and that the pain worsened. Snell testified that he returned to the company physician on several occasions, with continued complaints of pain, and that the company physician never ordered any diagnostic tests.
Snell testified that he suffered an injury to his right knee on April 17, 1997, during the course of his employment with Goodyear. He stated that he was "pushing out storage trucks" and was favoring his right leg because of pain that was radiating into his left leg because of his lower-back injury, and that his right knee "went out." Snell underwent surgery to repair the injured knee and was out of work from May 1997 to July 1997. He stated that the knee surgery was successful and that he returned to work with no restrictions related to his knee.
Snell returned to the company physician in September 1997 with continued complaints of low-back pain. He stated that he was prescribed physical therapy for his back; that he underwent physical therapy for approximately three weeks; and that the therapy did not help to alleviate or reduce his lower-back pain. He continued to work his normal duties while undergoing the physical therapy.
After completing the physical therapy, Snell returned to the company physician, who prescribed additional pain medication *Page 996 
and told Snell that if his symptoms did not improve he would order an MRI. Snell's symptoms continued and he was eventually referred for an MRI. The MRI revealed that Snell had suffered a herniated disc at the L5-S1 level on the left side.
Snell was referred to Dr. Swaid Swaid, a neurosurgeon, in March 1998. Dr. Swaid testified that Snell had informed him that he had pain in his lower back that radiated into both hips as the result of a work-related injury suffered in October 1996 and that the pain had worsened over the previous six months. Dr. Swaid testified that he reviewed Snell's MRI, which indicated that Snell had a disc herniation at the L5-S1 level. Dr. Swaid ordered a myelogram and a CT scan. Both the myelogram and the CT scan indicated that Snell had a herniated disc at the L5-S1 level on the left side. Dr. Swaid testified that because the herniation was on the left side it was a new injury different from the herniated disc Snell had suffered in 1989, which was on the right side. Dr. Swaid prescribed physical therapy for Snell and told him that if the pain became severe and intolerable he would perform surgery in an attempt to alleviate the symptoms.
Snell testified that he continued to work at his normal duties while undergoing the physical therapy ordered by Dr. Swaid and that his pain only increased. He returned to Dr. Swaid, who performed surgery on Snell on August 5, 1998, in order to repair the herniated disc. Snell returned to Dr. Swaid in September 1998 with continued complaints of pain, especially after sitting for a long time. Dr. Swaid prescribed additional physical therapy.
Following the physical therapy, Snell returned to Dr. Swaid on October 19, 1998, complaining of pain in his lower back and left hip and occasional numbness in his left foot. Dr. Swaid testified that he ordered a second MRI and that that MRI did not indicate any further abnormality that would require additional surgery. Dr. Swaid assigned Snell a permanent-partial-impairment rating of 9% and released him to return to work at full duty, without restrictions. Snell testified that the surgery performed by Dr. Swaid and the physical therapy following surgery did not alleviate the pain in his lower back.
Snell returned to work in October 1998. The company physician placed Snell on six hours of light-duty work and six hours of regular-duty work. Snell worked with this light-duty restriction until November 1998, when he was returned to his regular 12-hour shift of regular-duty work. He testified that he continued to work with lower-back pain and that his work duties caused the pain to increase.
Snell was referred to Dr. Mark Hadley, a neurosurgeon, on November 30, 1998. Snell continued to complain of low-back pain that radiated into his left hip and of numbness in his left foot. Dr. Hadley reviewed Snell's earlier MRI and concluded that further surgical treatment at that time would not be beneficial to Snell. Dr. Hadley noted that if Snell's symptoms worsened over time he should return for a repeat MRI.
Snell testified that because he continued to experience lower-back pain, he returned to Dr. Hadley on February 3, 1999. Dr. Hadley ordered an additional MRI and noted that he might not be able to offer Snell anything that would improve his condition. Snell testified that Dr. Hadley was very unfriendly to him and told him that he would order an MRI, but that it would not show anything different from the others.
Snell returned to Dr. Hadley on March 9, 1999. Dr. Hadley reviewed the MRI and noted that there was no abnormality present that would warrant additional *Page 997 
surgery. Dr. Hadley noted there was nothing else he could do for Snell.
Snell was laid off by Goodyear in March 1999. Snell was seen by Dr. Michael Cordover, an orthopedic surgeon, on May 17, 1999.[2] Dr. Cordover took a medical history of Snell, reviewed his MRIs, and ordered a myelogram. Dr. Cordover determined that surgery was necessary, and on July 29, 1999, he performed an anterior lumbar interbody fusion in order to repair Snell's herniated disc. Snell continued to return to Dr. Cordover for follow-up consultations. Dr. Cordover determined that Snell had reached maximum medical improvement on January 6, 2000. He testified that Snell had suffered a permanent partial impairment to his body as a whole as a result of his work-related injury of October 2, 1996, and assigned him an impairment rating of 19%. Dr. Cordover also placed on Snell permanent restrictions of no standing or walking for more than 30 minutes at a time; no lifting, pushing, or pulling of any weight more than 15 pounds frequently, and 20 pounds occasionally; and no bending, kneeling, squatting, climbing, stooping, or crawling.
Goodyear does not dispute that Snell was involved in a work- related accident on October 2, 1996. Further, Goodyear does not dispute that Snell suffered a herniated disc that required surgery in August 1998. However, Goodyear argues that the herniated disc suffered by Snell and ultimately treated by Dr. Cordover was not related to his work-related accident of October 2, 1996. For an injury to be compensable, it must be "caused by an accident arising out of and in the course of" the employee's employment. § 25-5-51, Ala. Code 1975. The phrase "arising out of" an employee's employment requires a causal connection between the injury and the employment. Dunlop Tire Rubber Co. v. Pettus,623 So.2d 313 (Ala.Civ.App. 1993). The phrase "in the course of" the employee's employment refers to the time, place, and circumstances under which the accident occurred. Id. In accident cases, i.e., those involving a sudden and traumatic event, an employee must produce substantial evidence tending to show that the alleged accident occurred and must also establish medical causation by showing that the accident caused, or was a contributing cause of, the injury. Ex parte Trinity Indus., Inc., 680 So.2d at 266 n. 3. The trial court may find medical causation without testimony from medical doctors. Ex parte Price, 555 So.2d 1060 (Ala. 1989). The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, ADiv. of USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ.App. 1993). Further, it is well settled that a conflict in the evidence as to medical causation in a workers' compensation case presents an issue of fact to be determined by the trial court, and not by the appellate courts of this state. ATEC Assocs., Inc. v. Stewart, 674 So.2d 1296 (Ala.Civ.App. 1995).
Dr. Swaid testified that Snell had suffered a herniated disc at the L5-S1 level on the left side, but he could not state whether it was related to Snell's October 2, 1996, work-related accident. Dr. Cordover testified that Snell's herniated disc was related to Snell's October 2, 1996, work-related accident. We note that before October 2, 1996, Snell was able to perform his normal duties at Goodyear without any complaints of pain, although he had had surgery in 1989 to repair a herniated disc. Snell testified that after his workplace accident on October 2, 1996, he continued to *Page 998 
work at Goodyear, but that he did so in constant pain that only grew worse over a period of time. He stated that the pain in his lower-back increased with his work activity. Snell testified that he continued to work because he had a family to support, including a daughter with a rare and incurable muscle disease.
After carefully reviewing the record, we conclude that the trial court's finding that Snell's injury was causally related to his October 2, 1996, workplace accident is supported by substantial evidence. In this case, the trial court received conflicting testimony as to medical causation and resolved the conflict in that testimony in favor of Snell. The court's judgment cannot be reversed simply because a conflict in the testimony existed and the court resolved that conflict in favor of Snell. ATEC Assocs., supra.
Goodyear next contends that the trial court erred in finding Snell permanently and totally disabled. We note that we apply a presumption of correctness to the court's findings of fact, including its determination of disability. Where ore tenus evidence is presented to the trial court, the court's findings of fact based on that evidence are presumed correct and will not be disturbed on appeal unless they are clearly erroneous and without supporting evidence. Mutual Sav. Life Ins. Co. v. Hogue,693 So.2d 530 (Ala.Civ.App. 1997). The test for permanent total disability is the inability to perform one's trade and to find gainful employment. Michelin N. Am., Inc. v. Hamby, 722 So.2d 770 (Ala.Civ.App. 1998). The court must apply a two-pronged test in determining whether a permanent total disability exists: the employee must be found to be incapable of returning to his trade, as well as incapable of being retrained for gainful employment. Id. "Total disability does not mean an entire physical disability or absolute helplessness." Id., at 773. The court is not required to make a specific finding that an employee cannot be retrained for gainful employment, because such a finding is implicit when the trial court concludes that the employee is permanently and totally disabled. Star Rails, Inc. v. May, 709 So.2d 44 (Ala.Civ.App. 1997). "`[G]ainful employment means employment similar in renumeration to that earned prior to the injury. Implicit in this is that the gainful employment sought to be restored must be "suitable." By "suitable" we mean employment which is compatible with the employee's preinjury occupation, age, education, and aptitude.'" Trans Mart, Inc. v. Brewer,630 So.2d 469, 471 (Ala.Civ.App. 1993), quoting Ex parte Beaver ValleyCorp., 477 So.2d 408, 412 (Ala. 1985). It is the duty of the trial court to make some determination as to the extent of disability. Hamby, 722 So.2d at 773. In making this determination, the trial court is not bound by expert testimony, but must consider all the evidence, including its own observations, and interpret it to its own best judgment. Burden v.Huckaba, 708 So.2d 199 (Ala.Civ.App. 1997). The court, in determining disability, may also consider the employee's own subjective complaints of pain. Hamby, 722 So.2d at 773.
Dr. Cordover testified that Snell is permanently and totally disabled from performing heavy manual labor, as a result of his lower-back injury suffered during the course of his employment with Goodyear. Dr. Cordover testified that the pain Snell experiences will remain a significant element in his life in the future. He stated that Snell's pain is present to such an extent that it would distract him from his daily activities. Dr. Cordover stated that Snell's pain would greatly increase with activity. He testified that Snell is not a malingerer. *Page 999 
Snell testified that his work activities at Goodyear aggravated his pain and made it worse. He stated that he has his good days and his bad days with respect to his pain. Snell testified that because of the pain he is limited in the amount of time that he can sit, stand, or walk. He stated that he has difficulty sleeping, lies around a lot during the day, and is no longer able to do any yard work. Snell testified that before his workplace injury his hobbies consisted of hunting, horseback riding, and woodworking. He stated that he is no longer able to participate in those hobbies, although he is able to hunt on a limited basis.
Snell presented evidence from his vocational expert indicating that he is 100% vocationally disabled and has a 100% loss of earning capacity. Goodyear presented testimony from its vocational expert indicating that Snell is 71% vocationally disabled.
After carefully reviewing the record, we cannot say the court erred in finding that Snell had suffered a 100% loss of ability to earn and was permanently and totally disabled.
Goodyear next argues that the court erred in failing to give it credit for certain accident and sickness benefits it had paid Snell. An employer may deduct payments made to an employee pursuant to plans providing for sick pay if the employer provided the benefits or the plans. §25-5-57(c)(1), Ala. Code 1975. Goodyear paid Snell approximately nine weeks and eight days of temporary-total-disability benefits at the rate of $458 per week, commencing August 8, 1998, and continuing through October 11, 1998. It paid Snell approximately 41 weeks of accident and sickness benefits at the rate of $340 per week, commencing on June 14, 1999, and continuing to the date of trial on April 5, 2000. Further, on February 9, 2000, Goodyear began paying Snell $118 per week, in addition to the $340 in accident and sickness benefits it was already paying him.
The trial court awarded Snell $458 per week as accrued permanent-total-disability benefits from the last date that Goodyear paid Snell temporary-total-disability benefits, up to the date of the final judgment in the case. The court did not provide Goodyear a credit for the payment of the accident and sickness benefits. In its postjudgment motion, Goodyear contended that the court had erred in requiring it to pay the accrued benefits without giving it a credit for the payment of the accident and sickness benefits. However, at the hearing on its postjudgment motion, Goodyear informed the court that there was no error with regard to its mathematical calculations of benefits owed to Snell. Accordingly, we find no error in the court's award of accrued benefits.
Finally, Goodyear argues that the court abused its discretion by taxing all court costs against it. The taxation of costs in a workers' compensation case is within the discretion of the trial court, and its ruling on that issue will not be reversed absent an abuse of that discretion. Star Rails, Inc. v. May, supra. We conclude that the court did not abuse its discretion in taxing costs to Goodyear.
AFFIRMED.
Crawley and Murdock, JJ., concur.
Thompson and Pittman, JJ., concur in the result.
[1] The right-knee injury and the neck injury are not issues on appeal.
[2] Dr. Cordover was not authorized by Goodyear as a treating physician, so Snell had to pay for Dr. Cordover's services with his own health insurance. *Page 1000