Goodyear Tire Rubber Company ("Goodyear") appeals the trial court's judgment in favor of its former employee, James Cranford. In 2003, Cranford injured his right knee while working for Goodyear. Cranford filed a workers' compensation complaint pursuant to § 25-5-81, Ala. Code 1975, in the Etowah Circuit Court on May 30, 2005, alleging that the injury had caused him to develop deep vein thrombosis ("DVT"), or a blood clot, in his leg. Cranford requested that the court determine that he was permanently and totally disabled and that he was entitled to workers' compensation benefits.
Notably, the parties did not dispute that Cranford's knee injury arose out of and in the course of his employment with Goodyear, that Goodyear had received notice of the injury, or that Cranford had been treated for the injury with arthroscopic surgery. Neither did the parties dispute that Cranford had a valid and compensable *Page 1123 
workers' compensation claim arising from the injury, nor that Cranford was entitled to temporary-total-disability benefits as a result of the injury. However, the parties did dispute whether Goodyear was liable to Cranford for workers' compensation benefits related to the DVT and whether Cranford was permanently and totally disabled as a result of the DVT.
Cranford testified at a hearing before the trial court, and the parties submitted documentary evidence, including the deposition transcripts of the parties' vocational experts and Cranford's treating physicians. On January 3, 2007, the trial court entered a judgment in which it found Cranford to be permanently and totally disabled and awarded weekly compensation accordingly. The trial court also awarded Cranford an attorney fee based on Cranford's life expectancy and the present value of the compensation award. Goodyear filed a postjudgment motion, which the trial court denied. Goodyear then filed a timely notice of appeal to this court.
The evidence reveals the following relevant facts. Cranford was 64 years old at the time of the final judgment. He had completed the 10th grade and had subsequently earned his general-equivalency diploma. Cranford had been employed with Goodyear for nearly 40 years and had worked in several different positions in Goodyear's manufacturing facilities during that time. In 2003, he worked as a whitewall inspector.
While Cranford was at work on June 21, 2003, he injured his right knee when he climbed down a ladder. He was examined by Dr. Christopher Kelley, who diagnosed him as having torn the medial meniscus, or cartilage, in his knee. Dr. Kelley recommended and performed outpatient arthroscopic surgery to repair the injury. The surgery was noninvasive and lasted 16 minutes. Cranford did not work for several weeks while he recovered from the injury and surgery.
Cranford's recovery progressed well, and in late September 2003 he was released to return to "light duty" work. While at work on October 10, 11, and 12, 2003, Cranford began to develop swelling in his lower right leg. The swelling worsened, and on October 13, 2003, Cranford consulted a doctor and was admitted to the hospital. He was diagnosed with DVT in his lower right leg.
Dr. Kelley defined DVT as "the abnormal coagulation of blood in the deep vein." Dr. Kelley explained,
 "the biggest risk with deep vein thrombosis is there is a small chance that the blood clot could break loose and travel through the venous system to the lungs — through the heart to the lungs and cause pulmonary or cardiac compromise or both, and can, in rare cases, lead to death."
Dr. Kelley testified that DVT may be caused by several factors, including a genetic predisposition, trauma, prolonged inactivity, or surgery. Regarding the cause of Cranford's DVT, Dr. Kelley stated, "although I would say the events [the surgery and the development of DVT] are related because there's no other apparent cause, it is generally accepted that, if one develops a deep vein thrombosis after arthroscopic surgery, one already had a high predisposition to developing a deep vein thrombosis." He further explained:
 "I think although [Cranford is] at a high predisposed risk for [DVT], any insult or injury no matter how minute, be it the injury itself and the surgery, . . . that yes, in this case, I would link the two together, the injury, the surgery, and the result of the deep vein thrombosis because of his predisposition." *Page 1124 
Cranford was hospitalized as a result of the DVT for nine days, and he did not return to work after October 12, 2003. His doctors testified that they treated him with coumadin, a blood thinner, to dissolve the blood clot. While he was in the hospital, Cranford began seeing Dr. Maria Sales for treatment of his DVT and management of the Coumadin treatment. In January 2004, Cranford experienced excessive bleeding as a complication of the Coumadin treatment, but Dr. Sales testified that she continued the treatment in order to completely dissolve the clot.
While Cranford was being treated with Coumadin, he was restricted from working, particularly in a manufacturing environment, because of an increased risk of bleeding if he were injured. Dr. Sales testified that Cranford "could return to work if it was his wish" when the Coumadin treatment ended. Although Cranford was still being treated with Coumadin, Dr. Kelley released him to return to work on June 28, 2004, with the expectation that he would retire almost immediately. Cranford did retire from his employment with Goodyear on July 1, 2004, and he began receiving retirement benefits.
Although DVT patients typically receive Coumadin treatment for only six months, Dr. Sales continued treating Cranford with Coumadin until December 2004. Dr. Sales testified that she continued the treatment because Cranford still showed symptoms of a blood clot. In December 2004, she discontinued the treatment because she believed that Cranford's remaining symptoms were caused by scar tissue on his vein and not by the continued presence of a blood clot. Dr. Sales then prescribed Cranford a preventative course of medication so that he would not develop another blood clot. Cranford's new medication did not have the same high risk of bleeding as Coumadin.
Cranford has not worked since October 12, 2003. He testified that at the time of the hearing he continued to experience swelling and pain in his lower right leg. Per his doctors' instructions, Cranford must not sit, stand, or walk for prolonged periods of time, and he must frequently walk or move his right leg in order to increase circulation. To reduce the swelling, Cranford must wear a surgical stocking, which he described as uncomfortable and hot. Dr. Sales stated that she believed that Cranford's continued symptoms were caused by scar tissue left by the blood clot, which restricted the flow of blood to and from his leg. Cranford is restricted from engaging in the following activities while working: squatting, kneeling, climbing, lifting, and prolonged sitting, standing, or walking.
Dr. Sales recommended that Cranford find work "that will be easy for him to do." Dr. Kelley testified that he would recommend work in an office-type setting or "the lightest type employment that there is." Dr. Kelley opined that Cranford was "considered a high risk for a recurrence" of a blood clot and that "without the deep vein thrombosis he would have been [released to work] without restrictions."
Dr. Kelley placed Cranford at maximum medical improvement on August 9, 2004. He explained Cranford's impairment as follows:
 "2% right lower extremity, status post right knee arthroscopy with partial medial meniscus. This translates to a 1% whole person impairment.
 "2% right lower extremity, status post deep vein thrombosis with residual edema. This translates to a 1% whole person impairment.
 "Using the combined value chart, this translates to a 4% right lower extremity and a 2% whole person impairment." *Page 1125 
Cranford's vocational specialist, Mary Kessler, testified that, based on Cranford's education, work experience, and physical limitations, she had determined that Cranford had suffered a 96% loss of access to jobs, a 58% loss of access to wages, and had an overall vocational-disability rating of 98% based on Dr. Kelley's recommendations. Kessler testified that, if his complaints of pain were believed, Cranford had a vocational-disability rating of 100%.
Goodyear's vocational specialist, Eddie Rice, testified that, considering Cranford's training and lack of experience in nonmanufacturing environments, and based on the preinjury physical demands of Cranford's work compared to his postinjury limitations, Cranford had suffered at least a 90% loss of access to occupations. Rice stated that he believed that Cranford was a candidate for vocational rehabilitation and that Cranford could perform jobs such as light security work, radio dispatching, light assembly work, and light driving. Rice calculated Cranford's earning loss at 64%, and he determined that Cranford had an overall vocational-disability rating of 77%.
Goodyear raises three issues on appeal.
 "In considering those issues, we will apply the following standards:
 "`When this court reviews a trial court's factual findings in a workers' compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala. Code 1975. Substantial evidence is "evidence of such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Further, this court reviews the facts "in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App. 1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala. 1996). This court has also concluded: "The [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App. 1995). However, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App. 2002) (citing § 25-5-81(e)(1), Ala. Code 1975).'
 "Reeves Rubber, Inc. v. Wallace, 912 So.2d 274, 279 (Ala.Civ.App. 2005)."
Hornady Truck Lines, Inc. v. Howard, 985 So.2d 469,475 (Ala.Civ.App. 2007), cert. denied, 985 So.2d 469 (Ala. 2007).
Goodyear first argues that Cranford suffered from a predisposition to DVT and that Cranford's work restrictions were related to risks associated with that predisposition, not the knee injury or even the blood clot. According to Goodyear, it is not responsible for the payment of workers' compensation benefits for Cranford's disability resulting from his predisposition to DVT. The only authority Goodyear cites to support its argument are Valtex, Inc. v. Brown,897 So.2d 332 (Ala.Civ.App. 2004), Goodyear Tire RubberCo. v. Snell, 821 So.2d 992 (Ala.Civ.App. 2001), andWal-Mart Stores, Inc. v. Kennedy, 799 So.2d 188
(Ala.Civ.App. 2001).
Goodyear cites Snell and Kennedy with its admission that "there may be evidence" that Cranford's knee injury caused or contributed to the development of the blood clot. Goodyear does not discuss either case in its brief. Both cases involved successive injuries, and in both cases this *Page 1126 
court stated, "In accident cases, i.e., those involving a sudden and traumatic event, an employee must . . . establish medical causation by showing that the accident caused, or was a contributing cause of, the injury." Snell,821 So.2d at 997; Kennedy, 799 So.2d at 195. Neither case supports Goodyear's argument that a disability resulting from, or restrictions associated with, a latent physical condition or a predisposition that was aggravated or made manifest upon a work-related injury are not compensable.
Regarding Brown, Goodyear admits that, unlike this case, Brown related to a nonaccidental injury. Goodyear nonetheless argues that the following statement regarding causation in nonaccidental-injury cases should apply: "`[m]erely showing that there is a close spatial or temporal relationship between the injury and the place or time of the claimant's performance of his or her job is not in itself always sufficient to satisfy either of the two prongs of Alabama's workers' compensation nonaccidental injury causation test.'" Brown, 897 So.2d at 335 (quoting Ex parteTrinity Indus., Inc., 680 So.2d 262, 269 (Ala. 1996)). Upon examining Brown, we cannot see that it applies to this case, nor do we see that it supports Goodyear's argument set out above.
We note that the evidence presented to the trial court showed that Cranford's knee injury and surgery contributed to cause him to develop a blood clot, which left scarring on the vein in his leg. The medical testimony showed that the scar contributed significantly to Cranford's continuing symptoms. If we were to consider Goodyear's arguments regarding causation, it appears that the evidence in this case supported a finding of medical causation, i.e., that Cranford's accident was a cause or contributing cause of his current condition. See Snell
and Kennedy, supra.
 Furthermore, this court has stated:
 "An employee is not precluded from collecting workers' compensation benefits even though the worker has a preexisting condition, if the employment aggravates, accelerates, or combines with, a latent disease or infirmity to produce disability. Dunlop Tire Corp. v. Allen, 659 So.2d 637
(Ala.Civ.App. 1995). `A preexisting condition that did not affect the employee's work performance before the disabling injury is not considered, pursuant to the Act, to be a preexisting condition.' Id., at 639."
Cox v. North River Homes, 706 So.2d 743, 748
(Ala.Civ.App. 1997) (emphasis added). In Cox, the employee injured his back and was diagnosed with chronic spondylolisthesis. His doctor explained that "a spondylolisthesis is a condition that begins to develop during adolescence and that may or may not be symptomatic. If it is symptomatic, it is frequently symptomatic after an injury. [The doctor] stated that Cox's history was consistent with an injury causing his spondylolisthesis to become symptomatic."706 So.2d at 746. The employer argued, and the trial court's order found, that the employee's condition was "`a longstanding problem'" and was not related to his employment and, therefore, not compensable. 706 So.2d at 748. Relying on the above-stated rule and the fact that the condition had not affected the employee's ability to work, this court found that the trial court had erred in denying benefits for the injury. Id.
Like the employee in Cox, Cranford had a latent condition that did not affect his work performance, but he became symptomatic upon his injury. The medical testimony showed that Cranford's injury "aggravate[d], accelerate[d], or combine[d] with, [his] latent disease or infirmity to *Page 1127 
produce disability." Cox, 706 So.2d at 748. As inCox, therefore, Cranford is not precluded from recovering workers' compensation benefits for the injury and his resulting disability. Based on the foregoing, we will not reverse the trial court's decision based on Goodyear's argument regarding Cranford's predisposition to DVT and the compensability of his current condition.
Next, Goodyear argues that Cranford is not permanently and totally disabled. Specifically, based on its first argument on appeal, Goodyear maintains that Cranford's restrictions relate only to the DVT and, therefore, that they are not job-related. In light of our discussion of Goodyear's first argument, we believe the evidence supports a conclusion that Cranford's current condition is job-related and that it may, therefore, properly be considered in determining the extent of Cranford's disability. Goodyear further argues that, even with the restrictions related to the DVT, the vocational experts testified that Cranford could perform a small category of jobs and that he could be retrained.
 This court recently explained:
 "The determination of the extent of disability is within the trial court's discretion and cannot be disturbed on appeal if there is evidence to support it. Dolgencorp., Inc. v. Hudson, 924 So.2d 727, 734 (Ala.Civ.App. 2005) (citing Golden Poultry Co. v. Staggs, 660 So.2d 1348, 1352
(Ala.Civ.App. 1995)). With regard to determining whether an employee is permanently and totally disabled, this court has stated:
 "`"The test for total and permanent disability is the inability to perform one's trade and the inability to find gainful employment." Fuqua v. City of Fairhope, 628 So.2d 758, 759 (Ala.Civ.App. 1993). See also Liberty Trousers v. King, 627 So.2d 422, 424 (Ala.Civ.App. 1993). A "permanent total disability" is defined as including "any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment." § 25-5-57(a)(4)d., Ala. Code 1975; Russell v. Beech Aerospace Services, Inc., 598 So.2d 991, 992
(Ala.Civ.App. 1992).'
 "Alabama Catfish, Inc. v. James, 669 So.2d 917, 918 (Ala.Civ.App. 1995). See also Boyd Bros. Transp., Inc. v. Asmus, 540 So.2d 757, 759
(Ala.Civ.App. 1988) (stating that § 25-5-57(a)(4)d., Ala. Code 1975, `requires that the employee be unable to perform his trade or unable to obtain reasonably gainful employment')."
CVS Corp. v. Smith, 981 So.2d 1128, 1136
(Ala.Civ.App. 2007).
The evidence showed that Cranford was restricted from working in a manufacturing environment and that manufacturing was the only work in which he had experience and training. Furthermore, Cranford's vocational expert, Kessler, testified that Cranford had a 98% or 100% vocational-disability rating. Based on this evidence, as well as evidence regarding Cranford's age and educational background, the trial court's judgment that he was permanently and totally disabled was supported by substantial evidence. Accordingly, the trial court's judgment is due to be affirmed as to this issue.
Finally, the parties agree that a clerical error exists in the trial court's calculation of the attorney fee and that the correct award is $46,882.64. We agree with the parties that the trial court's judgment on this issue is due to be reversed. *Page 1128 
Based on the foregoing, we reverse the trial court's judgment with regard to the attorney fee, and we remand the cause with instructions that the trial court enter an award reflecting the parties' agreement. We affirm the trial court's judgment in all other respects.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.