Jimmy Hamby was injured on November 17, 1995, while working as a tread applicator for Michelin North America, Inc. On November 14, 1996, Hamby sued for workers' compensation benefits, alleging that he had been permanently and totally disabled and that he had been continuously disabled from substantial work as a result of the on-the-job injury. Following ore tenus proceedings, the trial court made the following findings:
 "That [Hamby] was injured by an accident arising out of and in the course of his employment, in that, on November 17, 1995, while [he was] building a tire, [Hamby's] left foot slipped out from under him and he fell over a tread tray headfirst and as a result of the fall, he ruptured a disc in his neck and experienced pain in his back and hip, and that since the injury [Hamby] has continued to have trouble with his neck *Page 771 
and back and will continue to have trouble in the future and [Hamby] has continued to suffer severe chronic pain and depression as a proximate result of these injuries.
 "The Court finds that as a proximate result of these injuries and this accident, [Hamby] has suffered a permanent total disability to the body as a whole and the injury permanently and totally incapacitated [Hamby] from working at and being retrained for gainful employment.
 "The Court further finds that as a proximate result of said accident and said injuries, [Hamby] is unable to perform the work of his trade and is unable to find gainful employment.
 "The Court finds that [Hamby] has suffered a permanent and total loss of capacity to earn a livelihood.
 "That the average weekly wage of [Hamby] at the time of the accident was $776.88."
Michelin moved for a new trial, arguing that the court had misapplied the law to the facts of the case and that the judgment was contrary to the facts, and alleging that Hamby was capable of vocational rehabilitation and retraining. The court denied the motion. Michelin appeals.
Because of the date of Hamby's injury, this case is governed by the new Workers' Compensation Act. This new Act provides that an appellate court's review of the proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala. Code 1975. Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Exparte Trinity Industries, Inc., 680 So.2d 262, 268 (Ala. 1996), quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court."Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014
(Ala.Civ.App. 1995).
Michelin argues that the trial court's finding that Hamby is permanently and totally disabled is not supported by evidence presented at trial.
Jimmy Hamby, who was age 47 at the time of the trial, had been employed in Michelin's production department for 24 years. Hamby is a high school graduate, has completed two years of junior college, and has an IQ of 122.
Hamby testified he has not been able to work since the injury and that he medically retired from Michelin on September 26, 1996 — one day after reaching maximum medical improvement. Hamby also stated that Michelin's company doctor had stated that he was unable to work at the plant. Hamby testified that he had tried to return to work on light-duty status, but that complications because of pain prevented him from completing a full day of work at any given time:
 "What I was doing was real light-duty the four weeks I was in there on light-duty. I was doing paperwork, but standing a good bit, and stuff like that, would get me to hurting. Like I said before, during that period there were several times that I would tell [my supervisor] that I needed to go to the house. On some of the work, you would be holding your hands up filing paperwork and it was just kind of tearing me up."
Hamby stated that he was taking numerous muscle relaxers, anti-inflammatory drugs, and other pain medication as a result of the injury. The testimony also indicated that Hamby had had other medical problems before his injury. In 1978 and 1984, Hamby had operations on his back. He has also had a heart attack, a hernia, high cholesterol, a bad stomach, and, shortly before his injury, he was diagnosed with diabetes. Hamby testified that, despite his medical problems, he had always been able to work before he was injured and that he had never experienced any problems with his back after his 1978 and 1984 surgeries. He further stated that since his injury his extra-curricular activities *Page 772 
had been curtailed and that he had not had sexual relations with his wife.
 "My arms and my hands go to sleep on me and I have . . . real bad pain. When it's real bad, the medication don't touch it. My neck hurts most of the time. I hurt between the shoulder blades and I can't sleep much. My head turns in my sleep and my hands go to sleep and it wakes me up. I tend to drop things with my right hand. When it first started, I had what I call a `window' — well, my head doesn't turn very well to start with, but the — my window has gotten smaller to where I have to hunt for it sometimes because of my hand. My right hand will go to sleep and I have to hunt the spot where I can hold my head where it will wake up."
Hamby testified that he visits his psychologist, Dr. John Gamm, once a week. Dr. Gamm reported that Hamby suffered from depression, and he reported that Hamby felt as if he did not have a choice but to accept "compulsory medical retirement." Dr. Robert Allen, a neurologist, reported that Hamby's disc herniations at C5-6 and C6 arose from his on-the-job injury. He also reported that Hamby's two previous back surgeries and previous myocardial infarction did not contribute to his disability. Dr. Allen gave Hamby a 58% whole-person impairment rating and recommended that his medical treatment continue.
Dr. Max Burr, an orthopedic surgeon at the Hughston Clinic in Columbus, Georgia, gave Hamby a 20% impairment rating to the body as a whole. Dr. Burr initially saw Hamby on December 14, 1995. He reported that Hamby had a disc herniation to the left at C6-7; that Hamby could bend his neck to about 30 degrees, but extension beyond the neutral position was impossible; and that Hamby could bend approximately 20 degrees from the waist. Dr. Burr placed Hamby in a soft cervical collar and prescribed home traction and therapy until he could determine whether Hamby needed surgery.
Dr. Burr saw Hamby on numerous occasions. On Hamby's December 28, 1995, visit, Dr. Burr noted that Hamby was not feeling any better, had not responded to the therapy and steroids, and that there was some dysfunction in his lower back. On January 6, 1996, Dr. Burr reported that there was no need for immediate surgery on Hamby's lower back, but that he needed surgery for his neck. Hamby was then cleared for surgery and Dr. Burr performed a one-level procedure at the C6-7 level.
On January 29, 1996, Dr. Burr noted that Hamby was still experiencing operative discomfort and had some problems sleeping. Six weeks after the surgery, Hamby continued to experience pain in his neck and across his shoulders, along with numbness. Dr. Burr noted that neck mobility was severely limited and opined that Hamby's pain was due to stiffness from immobilization. Dr. Burr also noted that because Hamby had had problems at both ends of his spine, "the question in all probability is not going to be can he work, but what kind of work he should be doing. I think that we are going to find that this man is going to need to plan to work with some restrictions."
Dr. Burr's notes of March 28, 1996, reflect that Hamby had started having increasing pain in his neck and a sensation of prickling and tingling down his right arm into the thumb and the next three fingers. Dr. Burr recommended therapy. On April 11, 1996, Dr. Burr noted that Hamby had carpal tunnel syndrome, and on that date he referred him to another doctor. Dr. Burr also recommended that "there was light work available" and that he was going to let Hamby return to a job where he can "limit his lifting to five pounds." Dr. Burr also noted that Hamby "needed to keep his work between his shoulders and his hips and he needs to avoid bending, reaching, pushing, pulling, and things of that nature. He needs to avoid repetitive use of his arms and he needs to be able to get up and move around and change positions at will."
Dr. Burr testified that in September 1996, Hamby was still having symptoms, but that he "did not find anything that would strongly suggest further surgery." Dr. Burr stated that when Hamby returned in December 1996, he still complained of continued neck pain and that when Hamby "looks up or turns his head to the left side, his left arm will go to sleep." Dr. Burr further stated *Page 773 
that he did not deny that Hamby was having pain, but that he did not find anything indicating that further surgery was needed. Dr. Burr suggested a neurological consultation to determine whether the carpal tunnel syndrome was causing some of Hamby's arm symptoms.
Myrtice Carr, Hamby's vocational expert, evaluated Hamby and reviewed his Functional Capacity Evaluation (FCE) along with the depositions of Hamby and Dr. Burr. Carr testified that she estimated Hamby's loss at "99 point something" and stated that there were only a few jobs that Hamby would be able to perform. She stated that it would take approximately $30,000 to retrain Hamby, because he did not have any transferable skills.
Carr stated that the difference between her evaluation and that of the other vocational expert is attributable to the reaching handicap. Carr stated that she assessed Hamby a 100% disability rating because of his restrictions on reaching overhead and reaching from waist-up level. She further stated that the United States Department of Labor did not differentiate between "reaching overhead from pure reaching." Carr testified that because the Department of Labor has not clarified this area, and because reaching overhead is something that Hamby must completely avoid, Hamby has a 100% loss of employability. She stated that there were only seven jobs reasonably feasible for Hamby, which equated to his having over a 99% loss. She further testified that she did not think Hamby could be employed anywhere in Lee County.
Donna Kerr, Michelin's vocational expert, evaluated Hamby on October 3, 1997. Kerr-testified that Hamby was very bright and had an IQ of 122. Kerr stated that Hamby was restricted from lifting anything over 20 pounds and was to do no overhead lifting. She testified that Hamby could not make any side-to-side movements and could possibly perform light-duty work. She assessed him with a 56% vocational disability rating and stated that he had a 60% loss of wage-earning capacity. Kerr stated that her report reflects Hamby's restrictions and that she made adjustments for climbing, balancing, stooping, kneeling, crouching and crawling, but that "[r]eaching [was] not one of the physical demands we change in here." Kerr also stated that the Department of Labor distinguishes between different planes of reaching, but that "there was no way to adjust for reaching in one plane because the restriction is only in one plane and that [she] did not adjust for that." Kerr further stated that, unlike Carr, she was not concerned with the reaching aspect because Hamby was restricted only from overhead reaching.
Section 25-5-57(a)(4)d., Ala. Code 1975, defines a "permanent total disability" as including "any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitated the employee from working at and being retrained for gainful employment." In determining whether a permanent total disability exists, the trial court must apply a two-pronged test. Id.; MutualSavings Life Ins. Co. v. Hogue, 693 So.2d 530
(Ala.Civ.App. 1997). Hamby must be found to be incapable of returning to his trade, as well as incapable of being retrained for gainful employment. Id.
Additionally, the test for permanent total disability is the inability to perform one's trade and the inability to find gainful employment. Liberty Trousers v. King,627 So.2d 422 (Ala.Civ.App. 1993); Bidermann Industries Corp. v.Peterson, 655 So.2d 997 (Ala.Civ.App. 1994). Total disability does not mean an entire physical disability or absolute helplessness. Bidermann, supra. It is the duty of the trial court to make some determination as to the extent of the disability. Id. In making the determination, the trial court must consider all the evidence, including its own observations, and interpret it to its own best judgment. Id.
The trial court was faced with the difficult task of resolving the conflicting evidence presented before it. A trial court is not bound by the testimony of experts, and it may consider a worker's subjective pain in its determination of disability.Elite Transportation Services v. Humphreys,690 So.2d 439 (Ala.Civ.App. 1997). Hamby testified as to continuing pain. Dr. Burr testified that he *Page 774 
could not deny that Hamby was having pain. Kerr testified that in determining his employability she did not consider the fact that Hamby was on numerous medications. Kerr further agreed that Hamby could not go back to his former employment or trade. Carr testified that there were only seven jobs reasonably feasible for Hamby following his injury. After examining the record, we conclude that the trial court's finding of permanent and total disability is supported by substantial evidence.
AFFIRMED.
ROBERTSON, P.J., and MONROE, CRAWLEY, and THOMPSON, JJ., concur.