HOOPER, Chief Justice
(dissenting).
The question in this case is whether a judgment in a workers’ compensation case awarding the claimant benefits for a permanent and total disability is justified. Ala.Code 1975, § 25-5-57(a)(4)d., states:
“Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.”
According to Michelin North America, Inc. v. Hamby, 722 So.2d 770, 773 (Ala.Civ.App.1998), “the test for permanent total disability is the inability to perform one’s trade and the inability to find gainful employment.” It is essential that this Court follow the statutes enacted by the Legislature, to prevent this Court from becoming a super-legislature. Unless it is beyond doubt that a statute violates the fundamental law of this State, this Court accepts the statute as constitutional. See Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944). This Court may not subtly overrule a statute through *166 language that redefines words used in the statute, thereby rendering those words, as used in the statute, meaningless. I addressed the meaning of the “clear-and-convincing-evidence” requirement in Ex parte Trinity Industries, Inc., 680 So.2d 262, 268 (Ala.1996). I agree with the petitioner that it has presented a persuasive argument that the evidence presented by the plaintiff to the trial court was deficient in light of the standard imposed by Ala. Code 1975, § 25-5-81(c), and Trinity Industries, supra.
The facts, as I understand them, are as follows: Rocky Thomas, the plaintiff, filed a claim for workers’ compensation benefits; the claim arose from three on-the-job accidents. After each of those accidents, Thomas returned to work at his usual duties, without any restrictions or limitations, at an underground mine operated by his employer, Drummond Company. At the time of the accidents, Thomas was working as a “trip rider”; as a trip rider, he worked with and around underground locomotives, which are also called “trip riders.” Thomas was responsible for lifting more than 75 pounds, moving and hauling sacks weighing 50 to 100 pounds, operating equipment, bending and stooping to work on equipment, switching cars, and preparing motors. Much of his work involved moving in a crouched position.
On January 30, 1995, Thomas was riding a trip rider when it derailed; the derailment caused him to hit the roof of the mine. Dr. Marcus O’Mary, a chiropractor, checked Thomas’s back and released him to full-duty work on the following shift, without any restrictions or limitations. On December 16, 1996, Thomas hit his head against a T-board in the mine. After being off work for some time, Thomas returned to his regular job, earning his same pay and working his same hours, again without any restrictions or limitations. On April 17, 1997, Thomas stepped on a belt, twisted his back and fell. After this accident, Thomas returned to work at the Mary Lee mine, where he continued to work until he received notice that Drum-mond had laid him off.
After the third accident, Thomas returned to work without any restrictions or limitations. After that accident, he received several raises, and he continued working even after his working hours were changed from 8 hours to 10 hours per day. During this time, Thomas filed with Drum-mond a form stating that he was willing to work at a different mine as a trip rider, a supply brakeman, a motorman, or a laborer. Thomas never underwent surgery as a result of any of the three accidents. Thomas himself ranked his pain, on a scale of 1 to 10, as “probably a 3 every day or a 4 every day.” (R. 67.) Following each accident, his doctors released him to full-duty work without any restrictions or limitations. He also stated that he is able to hunt deer and turkey with a gun or rifle.
In addition to Dr. O’Mary, several medical doctors provided medical and vocational evidence to the trial court. Dr. R. Cem Cezayirli, a neurosurgeon, saw Thomas on May 2, 1995. He believed that Thomas might have a ruptured disk or two, and he had told Thomas he could have surgery or could continue on conservative treatment. He also recommended that Thomas get a second opinion regarding surgery. Dr. Cezayirli never placed any restrictions or limitations on Thomas’s work. He stated: “[Rjeally [he] had no restriction, he just had pain. So he doesn’t really have a— anything to keep him from working.” (C. 405.) Dr. Cezayirli believed a realistic impairment rating to be 5 to 10 percent.
Thomas saw Dr. Carter Harsh, another neurosurgeon, for another opinion. On May 30, 1995, Dr. Harsh gave Thomas a physical examination, which revealed that Thomas’s “strength ratio” was normal; this fact indicated that there was either no nerve root compression or insufficient compression to cause weakness. Dr. Harsh saw Thomas again on December 26, 1996, because he had been experiencing pain on and off and because he had suffered a second injury two weeks before. *167 Dr. Harsh performed another physical examination, which resulted in the same analysis as the May 1995 examination. Dr. Harsh performed an MRI (magnetic resonance imagery) test on Thomas on January 6, 1997; it showed nothing abnormal. (C. 447.) Dr. Harsh’s opinion was that Thomas “was showing excellent recovery, he was going to continue full duty, [he had a] [z]ero percent impairment rating relating to his injury.” On May 19, 1997, Thomas reported an exacerbation of his injury. On June 12,1997, Thomas saw Dr. Harsh, who did not take Thomas off work or place any restrictions upon him. Dr. Harsh assigned Thomas a zero-percent permanent-partial-impairment rating based on his first and second accidents. Dr. Harsh stated that Thomas reported decreased pain during the period of his visits with him.
On May 30, 1995, Dr. Zenko Hrynkiw, another neurosurgeon, examined Thomas and was of the opinion that Thomas suffered from sciatica (pain that radiates down the leg in the sciatic-nerve distribution) and needed a home-based exercise regimen. Dr. Hrynkiw assigned a zero-percent permanent-partial-impairment rating to Thomas.
Dr. Jeffrey Pirofsky, a specialist in physical medicine and rehabilitation, saw Thomas on June 24, 1997, and found his strength to be normal. On July 2, 1997, Dr. Pirofsky saw Thomas again; he had access to Thomas’s complete medical records, including the information about the disk herniations. At that point, Dr. Pirof-sky recommended to Thomas that he undergo a selective nerve-root block, but Thomas told him he wanted to try everything to avoid surgery. Dr. Pirofsky said that a nerve-root block would help achieve that goal. Thomas agreed to the injection and also began physical therapy. Dr. Pi-rofsky saw Thomas on July 16, 1997, and on that date Thomas told him his pain had decreased. Dr. Pirofsky recommended another nerve-root block and recommended that he continue physical therapy. After having an allergic reaction to the second nerve-root block, Thomas did not receive any more blocks. In August 1997, Dr. Pirofsky noted that Thomas’s condition was basically unchanged. He discussed surgery with him, but Thomas again objected to surgery. Thomas also told Dr. Pirofsky that he took medications on a “rare basis.” Dr. Pirofsky performed a functional capacity evaluation (an “FCE”) for Thomas; it showed Thomas as “qualified on the low end of heavy work [with] his lifting 57 pounds from floor to waist and 80 pounds from waist to overhead.” (C. 510-11.) Dr. Pirofsky placed Thomas at “maximum medical improvement” effective August 21, 1997, and assigned him a 15% permanent-partial-impairment rating.
Dr. Pirofsky released Thomas to heavy-work classification, with a weight restriction of 57 pounds, and he deferred to the FCE for Thomas’s restrictions on squatting, standing, sitting, walking, stair-climbing, and kneeling. Dr. Pirofsky left it to Thomas’s supervisor to review the FCE to determine what kind of work Thomas could return to. He also testified to Thomas’s being a patient with an unwillingness to improve his condition: “Out of all the patients I have treated, [Thomas] has probably been one of the most difficult as far as trying to convince what I felt that patient needed.” (C. 522.)
Oliver J. Daniel, an occupational therapist and functional capacity evaluator, testified that he had preformed an FCE of Thomas. Daniel explained that an FCE assesses an individual’s ability to perform certain activities required for work. Daniel was also involved in directing Thomas’s rehabilitation. Daniel testified:
“[Thomas] was capable of lifting 57 [pounds] from floor to waist on an occasional basis which would be from zero to 33 percent of a normal workday and 80 pounds from waist to overhead on an occasional basis. He also [demonstrated] the ability to carry 81 pounds for a distance of 50 feet-He also demonstrated the ability to exert an isometric push force of 111.6 pounds and an isometric pull force of 127.6 pounds. His *168 activities were stated at a constant frequency, which would be two-thirds to 100 percent of a normal workday for gripping and grasping; in other words, he could use his hands constantly. And I rated him at frequent, which is from 33 percent to 66 percent of the workday, at squatting, standing, sitting, walking, stair-climbing, static and repetitive kneeling and stooping and bending.”
(R. 179-80.)
Daniel recommended that Thomas be released to work in the heavy-work classification, with specific weight limits on his lifting. Daniel did not think Thomas’s pain was unmanageable or was so severe that he could not return to work. Thomas himself rated his pain during his rehabilitation with Daniel as, on a scale of 1 to 10, 5 at worst.
Drummond’s vocational expert, Renea Whitson Smith, saw Thomas on March 24, 1998. She performed an initial interview, a “Wide Range of Achievement Test” (academic-level evaluation), and an “Ammons Cognition Test” (IQ test), and she reviewed all of Thomas’s medical records and depositions. The Ammons test showed Thomas’s IQ as above average; the Wide Range test showed Thomas functioned at the high-school reading level, the fourth-grade spelling level, and the fifth-grade arithmetic level. Taking into account Thomas’s statements to her as to his opinion of his own abilities; the tests mentioned here; and his complaints of pain, Smith assigned Thomas a 20% vocational-disability rating as a result of his on-the-job injuries. She said that if Thomas is unable to return to work in the mine and can return to only medium-duty work, then he has a 40% vocational disability. Smith also considered Thomas an excellent candidate for vocational rehabilitation.
Thomas’s vocational expert, Bill Crunk, met with him on December 22, 1997, and obtained background information on him. Crunk did not test Thomas on his academic functions, because Thomas has a high school diploma and appeared to Crunk to be of average abilities. Crunk opined that Thomas has a 92% “vocational-employability disability” and loss of earning capacity. Crunk’s opinion was that if Thomas’s pain is moderately severe to severe, however, Thomas would have a 100% loss of earning capacity. Crunk testified that an FCE is a good way to assess what a person is capable of doing because, he said, it objectively and subjectively tests an injured worker’s capabilities. Crunk stated that it is always in the worker’s best interests to return to work. Crunk stated, “[Tjhere is no question that if [Thomas] didn’t have the pain at the level [sic], he would be employable.” Based on Thomas’s testimony that he considered his pain to be at 3 to 4 on a scale of 1 to 10, meaning he had moderate or mild pain, Crunk’s opinion was that Thomas’s vocational disability was 92%.
I stated my concerns about the reasoning of Trinity Industries, supra, in my dissent in that .case. I think the courts have strained to find ways to compensate injured workers at the expense of a fair consideration of the evidence. Employers certainly have a financial incentive to seek to lower workers’ compensation payments to the lowest possible dollar figure. However, employees have a financial incentive to raise workers’ compensation payments to the highest possible dollar figure. I do not believe every worker seeking workers’ compensation has fraud in mind. However, the temptation to exaggerate pain in subjective cases like Thomas’s is detrimental to the workers’ compensation system and to the worker. It is detrimental to the system because it creates a cynical attitude in employers and spurs them to greater efforts to pay the lowest amount, even in the case of an employee who truly has been injured to the point of being unemployable. However, it also harms the employee because, even if the employee does not have the conscious intention of “milking” the workers’ compensation system, he does have the incentive to convince everyone, even himself, that he is no longer a productive member of society. In my opinion, that potential psychological damage to a human being is worse than the *169 most severe pain in the world. By blithely awarding a 100% disability rating to a worker, a court adds a monetary incentive and its judicial imprimatur to the psychological incentive. I imagine it is difficult to escape the psychological box into which a worker is placed upon winning a workers’ compensation case. In other words, it would be hard for the sincere workers’ compensation plaintiff to work again even if he or she was capable. Such a decision also creates bad precedent for, and harms, employers. Even more importantly, judgments finding a i.00% disability undermine the meaning of statutes by changing the plain meaning of the words of the statute-this causes damage that is subtle, yet dangerous to the health of the State and its courts.
Drummond’s evidence calls into question the disability rating assigned to Thomas and calls into question whether he is incapable of performing his trade or finding gainful employment, as required by Ala. Code 1975, § 25 — 5—57(a)(4)d. This Court should at least issue the writ of certiorari, so that it can examine the record more carefully to determine whether the plaintiff presented substantial evidence supporting a 100% permanent and total disability rating. Therefore, I respectfully dissent from the order denying the petition for the writ of certiorari.