893 So.2d 413 (2003)
STEELCASE, INC.
v.
Johnny W. RICHARDSON.
2020158.
Court of Civil Appeals of Alabama.
October 31, 2003.
*415 D. Edward Starnes III and Rodney C. Lewis of Lanier Ford Shaver & Payne, P.C., Huntsville, for appellant.
*416 Jeffrey G. Blackwell and S.A. Watson, Jr., of Hornsby, Watson, Hornsby & Blackwell, Huntsville, for appellee.
PER CURIAM.
Johnny W. Richardson sued his employer, Steelcase, Inc., on July 8, 1994, seeking to recover workers' compensation benefits for injuries he sustained to his back on November 15, 1991, and August 20, 1992, in the line and scope of his employment with Steelcase. On February 27, 1996, Richardson and Steelcase entered into a settlement agreement whereby they agreed to settle Richardson's workers' compensation claims. Under the terms of the settlement agreement, Richardson retained his rights under § 25-5-57(a)(3)i., Ala.Code 1975, to petition for reconsideration of his permanent partial disability rating under certain circumstances. On that same date, the trial court approved the settlement agreement and entered a judgment accordingly. In its judgment, the trial court stated that Richardson "shall retain his rights under the provisions of § 25-5-57(a)(3)i., Ala.Code 1975, as it applies to [his] accident and injury of August 20, 1992."
On May 12, 1998, approximately 299 weeks after his injury, Richardson voluntarily quit his employment with Steelcase. On May 21, 1998, Richardson petitioned the court, pursuant to § 25-5-57(a)(3)i., for reconsideration of his permanent partial disability rating with respect to his August 20, 1992, injury.
Following an ore tenus proceeding, the trial court, on October 7, 2002, entered a judgment granting Richardson's petition for reconsideration and entered an order finding Richardson to be 100% permanently and totally disabled. The trial court made the following pertinent findings of fact and conclusions of law:
"[Richardson] is a forty-six (46) year old man with little education and very little academic capability. [Richardson] completed school only through the eleventh (11th) grade, although he did later obtain a GED. He possesses no further education or formal training. According to testing conducted on [Richardson], he reads, spells, and performs arithmetic, below a high school level. In fact, testing places [Richardson] only in the first (1st) percentile in spelling and fifth (5th) percentile in reading.
"[Richardson] has spent his entire working life with only two (2) different employers. [Richardson] first worked for 72 Marine Center as a mechanic. Then, in 1984, [Richardson] began working for the Defendant, Steelcase. Both of these jobs required [Richardson] to perform strenuous physical activities, including heavy lifting. In the past, in addition to his formal employment, [Richardson] also performed various yardwork for others.
"In November, 1991, [Richardson] suffered a work-related injury to his back while performing his job for [Steelcase]. Following this injury, [Richardson] received medical treatment with various physicians, including a neurosurgeon, Dr. Frank Haws, and a chiropractic physician, Dr. Kenneth Eldred. Dr. Haws diagnosed [Richardson] as suffering from a herniated disc at L5-S1 and performed back surgery on [Richardson] to correct this condition. Then, after a period of recuperation, [Richardson] returned to work at Steelcase and resumed the full, regular duties of his employment. According to the testimony of Dr. Kenneth Eldred, [Richardson] completely recovered from this 1991 work-related injury. That injury does not form the basis of the present claim for workers' compensation benefits.

*417 "On August 20, 1992, [Richardson] suffered a second work-related injury to his back at Steelcase. The testimony revealed that this injury occurred while [Richardson] was performing the normal and regular requirements of his job. [Richardson] provided Steelcase notice of this accident and injury as required by the Alabama Workers' Compensation Act. According to the medical evidence, [Richardson] ruptured his disc again at the L5-S1 level in this accident. On October 13, 1993, Dr. Haws again performed surgery on [Richardson], including a lysine of adhesions and a laminectomy to remove the herniated disc.
"Following the August 20, 1992, work-related injury and resulting surgery, [Richardson] continued to suffer severe pain and physical limitations. Although in pain and with significant limitations, Richardson did return to the job site. [Richardson] filed a workers' compensation claim for his injury on July 8, 1994. However, because [Richardson] returned to work at a wage equal to or greater than his pre-injury wage, the parties settled that workers' compensation claim for benefits based solely upon [Richardson's] impairment rating, subject to the provisions of Ala.Code § 25-5-57(a)(3)i. which allows an injured Plaintiff to petition the Court later for a reconsideration of his disability should he lose his employment within three hundred (300) weeks of the injury, subject to certain limitations in the statute.
"Although [Richardson] returned to work following his August, 1992, work-related injury, [Richardson] was never again able to perform his pre-injury job duties with [Steelcase]. He presented to work with significant pain and limitations which progressively worsened over time. After returning to work following this injury, Steelcase placed [Richardson] in several different positions. These positions included a temporary maintenance position which involved answering phone calls. They also included unsuccessful attempts to perform strenuous physical labor in the trim department, the department where [Richardson] previously worked at the time of his injury. Finally, [Richardson] worked in a position which Steelcase's representative termed as a `Parts Chaser,' where [Richardson] was simply required to retrieve an occasional small part.
"As stated previously, [Richardson] continued to suffer severe pain and physical limitations although he attempted to work. He continued seeking significant medical treatment for his chronic pain from physicians, including an orthopedic surgeon, Dr. Martin Jones, and a chiropractic physician, Dr. Kenneth Eldred. Due to the pain and limitations from his injury, [Richardson] frequently was unable to even attend the jobsite. Over the course of time, as his condition progressively worsened, [Richardson's] numerous absences from work continued to increase in frequency. On those occasions when he could physically make it to the jobsite, he was unable to perform any significant work. [Richardson], due to his injury, finally became so debilitated that he was unable to even arrive at the jobsite; and therefore, [he] quit working for [Steelcase] in May, 1998.
"At trial, the Court was presented with conflicting evidence concerning the actual date upon which [Richardson] was last employed by [Steelcase]. [Richardson] testified that he last worked for [Steelcase] on May 12, 1998. The evidence was unclear as to whether [Richardson] effectively communicated his termination of employment on May 12, 1998, or a couple of days later when he again informed [Steelcase] that he had *418 quit his employment. Either occasion would place the cessation of his employment within three hundred (300) weeks of the injury. [Richardson's] representative, Rayburn Hughes, presented contradictory testimony by testifying to a much later date at trial, but he had previously testified in deposition that [Richardson] last worked on May 12, 1998. The Court is reasonably satisfied by the evidence that [Richardson] left his employment with [Steelcase] on May 12, 1998, within three hundred (300) weeks of his August 20, 1992, work-related accident and injury.
"Because [Richardson] suffered a permanent disability from a work-related injury, then returned to work at an equal or greater wage, but subsequently lost his employment within three hundred (300) weeks of the injury, the provisions of Ala.Code § 25-5-57(a)(3)i. are applicable. Under that [s]ection, [Richardson] may seek a determination of his true vocational disability unless the loss of employment is due to one of the enumerated exceptions in the statute. In this case [Steelcase] contended that the specific exception in the statute, which prohibits the assessment of the workers' true vocational disability in the event the loss of employment was voluntary without good cause connected to the work, was applicable. See Ala.Code § 25-5-57(a)(3)i.(ii). However, under the Act, it is the [employer's] burden to prove, by clear and convincing evidence, that the [employee's] loss of employment was due to the enumerated exception. The Court has carefully weighed the evidence on this issue and concludes [Steelcase] has failed to meet its burden on this issue. Rather, the evidence at trial revealed that the loss of employment was for a good cause connected to said work, i.e., [Richardson's] physical inability to attend the jobsite or continue his employment with [Steelcase]. Thus, the Court can, and has, carefully considered all the evidence of [Richardson's] vocational disability in reaching its conclusion and judgment in this case.
"This court deems it appropriate to note that [Steelcase] introduced evidence at trial which was strenuously pressed by [Steelcase] as suggesting that [Richardson] was not only, not physically disabled, but, indeed, had sufficient physical capability to own and operate a business which provided services cleaning parking lots and providing certain lawn care. [Steelcase] adduced evidence tending to show that [Richardson] was the nominal owner of such an enterprise. In response to that line of evidence, [Richardson] adduced testimony tending to show that the business was, in fact, operated by [Richardson's wife] utilizing family members other than [Richardson] to perform actual parking lot cleaning and lawn care tasks. Having considered all the testimony and evidence concerning this issue, this Court is persuaded that this business was not a business physically conducted by [Richardson], nor participated in by [Richardson], to any significant degree."
Steelcase appeals.
This case is governed by the 1992 Workers' Compensation Act. This Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala.Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the *419 exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996), quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This court has also concluded: "The [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).
Steelcase argues that the trial court erred in granting Richardson's petition to reconsider his permanent partial disability rating because, it says, Richardson's loss of his employment was "voluntary, without good cause connected [to his] work." At the outset we note that pursuant to § 25-5-57(a)(3)i., an employee who has received limited permanent partial disability benefits after returning to work earning the same or higher wages may, in certain circumstances, petition the court for reconsideration of his or her permanent partial disability rating unless a statutory exception applies. Section 25-5-57(a)(3)i., provides, in pertinent part:
"i. Return to Work. If, on or after the date of maximum medical improvement, except for scheduled injuries as provided in Section 25-5-57(a)(3), an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability. Notwithstanding the foregoing, if the employee has lost his or her employment under circumstances other than any of the following within a period of time not to exceed 300 weeks from the date of injury, an employee may petition a court within two years thereof for reconsideration of his or her permanent partial disability rating:
"....
"(ii) The loss of employment is voluntary, without good cause connected with such work.
"....
"The burden of proof is on the employer to prove, by clear and convincing evidence,[[1]] that an employee's loss of employment was due to one of the causes (i) through (v) above. At the hearing, the court may consider evidence as to the earnings the employee is or may be able to earn in his or her partially disabled condition, and may consider any evidence of vocational disability. The fact the employee had returned to work prior to his or her loss of employment shall not constitute a presumption of no vocational impairment. In making this evaluation, the court shall consider the permanent restriction, if any, imposed by the treating physician under Section 25-5-77, as well as all available reasonable accommodations that would enable the employee in his or her condition following the accident or onset of occupational disease to perform jobs that he or she in that condition otherwise would be unable to perform, and shall treat an employee able to perform with such accommodation as *420 though he or she could perform without the accommodation."
It is undisputed that Richardson's "loss of employment" was voluntary. Therefore, we turn to whether that "loss of employment" was for "good cause connected with [his] work." Although "good cause" is not defined in § 25-5-57(a)(3)i.(ii), this court has interpreted similar language in the context of unemployment-compensation cases. See § 25-4-78(2), Ala.Code 1975 (providing that an individual shall be disqualified for unemployment benefits "[i]f he has left his most recent bona fide work voluntarily without good cause connected with such work"). Cases construing particular provisions in Alabama's unemployment-compensation laws have been deemed persuasive authority in interpreting similar provisions appearing in our workers' compensation laws. In Melcher v. American Cast Iron & Pipe Co., 848 So.2d 991, 996 (Ala.Civ.App.2002), this court applied cases interpreting language appearing in § 25-4-78(3)b., Ala.Code 1975 (providing that an individual shall be disqualified for unemployment benefits "[i]f he was discharged from his most recent bona fide work for actual or threatened misconduct committed in connection with his work ... repeated after previous warning to the individual"), to an analogous workers' compensation statute, § 25-5-57(a)(3)i.(iv) (precluding reconsideration of an employee's permanent partial disability rating where "[t]he loss of employment is for actual or threatened misconduct committed in connection with his or her work after a previous warning to the employee"). Thus, we deem the judicial construction of "good cause" under § 25-4-78(2) to be persuasive in interpreting § 25-5-57(a)(3)i.(ii).
In Director, Department of Industrial Relations v. Ford, 700 So.2d 1388, 1390-91 (Ala.Civ.App.1997), an unemployment-compensation case, this court stated:
"The Alabama Code of 1975 does not define `good cause' for purposes of § 25-4-78(2); neither did its predecessor. The language in § 25-4-78, Ala.Code 1975, is virtually identical to the language in Tit. 26, § 180 et seq., Ala.Code 1940, which dealt with unemployment compensation. In interpreting the term `good cause' for the purposes of unemployment compensation under the 1940 Alabama Code, the Alabama Court of Appeals in 1950 ruled that `the legislature meant a reasonable cause, one that is material and substantial as applied to a particular set of facts.' This Court has adopted the same language in interpreting `good cause' under the 1975 Code of Alabama: '... in order to be eligible for unemployment compensation benefits, § 25-4-78 requires an employee to terminate employment for a reasonable cause, i.e., a cause that is material and substantial under the circumstances.'"
(Citations omitted.) This court has also stated that "good cause" means "`whether it is reasonable when measured by what the average or normal worker would have done under similar circumstances.'" Hadley v. Director of Dep't of Indus. Relations, 473 So.2d 519, 520 (Ala.Civ.App.1985) (quoting Andala Co. v. Ganus, 269 Ala. 571, 572, 115 So.2d 123, 125 (1959)); accord, Director, State Dep't of Indus. Relations v. Jones, 669 So.2d 170 (Ala.Civ.App.1995)." `Good cause' for leaving one's employment may well be prompted by the claimant's ill health or physical infirmity where the illness or infirmity results from, is connected with or is caused by the employment." Polk v. State Dep't of Indus. Relations, 398 So.2d 722, 723 (Ala.Civ.App.1981) (citing Department of Indus. Relations v. Chapman, 37 Ala.App. 680, 74 So.2d 621 (1954)).
*421 "Good cause" always includes the element of "good faith." Lagrone v. Department of Indus. Relations, 519 So.2d 1345, 1347 (Ala.Civ.App.1987); Department of Indus. Relations v. Lynch, 370 So.2d 1050 (Ala.Civ.App.1979); Department of Indus. Relations v. Estes, 45 Ala.App. 360, 364, 231 So.2d 137, 140 (Civ.App.1970); Stewart v. Department of Indus. Relations, 40 Ala.App. 383, 114 So.2d 274 (1959). In Stewart, the court stated:
"It has been said that a good cause must be based on good faith. Johnson v. Unemployment Compensation Board of Review, 187 Pa.Super. 607, 146 A.2d 152 [(1958)].
"`... A claimant who neglects to take those precautions to guard his job which a reasonably prudent person would have taken has, in effect, left his employment voluntarily....' Junda v. Unemployment Compensation Board of Review, 188 Pa.Super. 254, 146 A.2d 344, 347 [(1958)]."
40 Ala.App. at 385, 114 So.2d at 276.
Alabama caselaw has required employees to make a good-faith attempt to resolve work problems before quitting. In Hadley, 473 So.2d 519, a seamstress voluntarily quit one day after having been informed that minimum production levels were being increased; the seamstress quit her work because she felt that the increase in minimum production levels would reduce her pay. Although a union-negotiated grievance procedure existed, she never utilized that procedure. We affirmed the trial court's judgment that the employer's grievance policy was reasonable and that the seamstress's failure to follow the grievance policy or to attempt to meet the new minimum production standards, without offering any valid excuse, evidenced a willful disregard for the consequences and an indifference as to whether she worked. 473 So.2d at 520-21.
Similarly, in Lagrone, 519 So.2d 1345, an employee "walked away" from a work assignment after having worked approximately six hours at his job that particular day. Two months before that incident, the employee notified his employer, in general terms, that his doctor had advised him to reduce his work hours. However, he failed to provide the employer with a medical report of his specific condition and had not attempted to make known to his employer any problem with the number of hours he had been working. We affirmed the trial court's conclusion that, under those facts, a reasonably prudent employee would have endeavored to resolve the work grievance in a less confrontational manner before taking the drastic step of quitting a job. 519 So.2d at 1346-47.
In State Department of Corrections v. Stokes, 558 So.2d 955 (Ala.Civ.App.1990), a correctional officer who claimed entitlement to unemployment compensation had resigned on the recommendation of her physician because she was experiencing depression after witnessing a prisoner's repeated masturbation in front of her. The officer reported her initial observations to her employer. Her supervisors directed her to write counselor's reports to institute progressive disciplinary procedures against the inmate, and the officer did so. After the officer had undergone extensive treatment for her depression, her physician recommended that she resign from her work, and she signed a notice of resignation indicating that her resignation was on the recommendation of her personal physician. At her exit interview, the officer did not state that her depression was because of her work at the prison. In distinguishing the facts in Stokes from the facts in Lagrone and Hadley, we stated:
"Clearly, the claimants in Lagrone ... and Hadley... had ample time and *422 methods available to attempt to resolve work problems. In the facts before us now, that is simply not the case. The claimant here had followed her supervisors' instructions regarding the progressive disciplinary process for the inmate. The evidence showed that she wrote the inmate a disciplinary action report on December 31, 1987, but was hospitalized before the disciplinary hearing was held. The hospitalization and intensive outpatient treatment that followed resulted in her physician's advising her not to return to work. Her resignation promptly followed."
558 So.2d at 958.
In Gibbons v. Shaddix Pulpwood Co., 699 So.2d 225, 227 (Ala.Civ.App.1997), a workers' compensation case, this court, without specifically defining the phrase "voluntary, without good cause connected with such work," affirmed a judgment concluding that, under the facts of that case, the employee's loss of employment had been "voluntary" and "without good cause connected with" his work within the meaning of § 25-5-57(a)(3)i.(ii). In doing so, we rejected the three purported "good reasons" the employee proffered for leaving his employment:
"Gibbons says that he had three `good reasons' for leaving his job with Shaddix. First, he says, he is limited to light-duty work and therefore, could not return to his job at Shaddix. This `good reason' is inadequate for at least two reasons. Gibbons left his job with Shaddix in May 1994, five months after his injury. At that time, he had not yet reached maximum medical improvement and he had not yet taken his `functional capacities evaluation;' therefore when he left Shaddix, he did not know he was limited to light-duty work. Furthermore, because Gibbons never told Shaddix he was leaving his job, he never gave the company a chance to move him to a job Gibbons thought he was physically capable of doing. In fact, Gibbons testified that he never discussed with Shaddix the possibility of moving to a different job.
"His second `good reason' is that he still has back pain and therefore cannot perform his old job. This `good reason' has nothing to do with why he left Shaddix without notice five months after the injury.
"His third `good reason' is that he `no longer resides in the state of Alabama.' He said that after his back injury, he had to move back to his family for financial reasons and because he wanted to be reunited with his family. The statute precludes a reconsideration of an employee's permanent partial disability rating if the `loss of employment was voluntary, without good cause connected with such work.' § 25-5-57(a)(3)i.(ii), Ala.Code 1975 (emphasis added [in Gibbons]). Leaving his job with Shaddix to move to another state is not a reason `connected with such work.'
"Boiled down, the evidence indicates that Gibbons voluntarily left Shaddix with no notice and that after reaching maximum medical improvement, he went to work at a much higher-paying job. Therefore, the trial court acted properly in not considering evidence of Gibbons's vocational disability."
Gibbons, 699 So.2d at 227.
Steelcase relies upon Gibbons to argue that Richardson's voluntarily leaving his employment was without a "good cause,"; however, we find Gibbons distinguishable from the facts of this case. Richardson testified that he voluntarily quit his employment with Steelcase on May 12, 1998, and that he did not seek a different position or any further accommodation from Steelcase before doing so. It is undisputed *423 that Steelcase had accommodated Richardson since his return to work after his August 1992 work-related injury. He was unable to perform the strenuous physical duties required of his preinjury position in the "trim" department. Steelcase placed Richardson in a more sedentary job in the maintenance department. In this position, he would type purchase orders, process time cards, and drive the company truck to pick up parts on occasion. He stated that he would perform any "little errand" that needed to be done. Richardson testified that he experienced back pain and was regularly missing work during this time.
Steelcase transferred Richardson to a "parts bag job" and this was the job that Richardson was working in at the time he quit his employment with Steelcase. The "parts bag job" was a light-duty job that required Richardson to lift a box weighing approximately 40 pounds onto a table and then take small parts, which weighed less than 1 pound, from the box and place them in bags. The nature of this job allowed Richardson to sit, stand, or walk around as needed. He testified that he was unable to perform this job because he was unable to lift the box of parts onto the table and had to obtain the assistance of coemployees in lifting the boxes. Richardson claims that he could not perform his job because of his lower back pain (as well as pain and numbness in his right leg).
Richardson missed a substantial amount of work within the two-and-one-half-month period before he quit. He stated that when he was able to come to work he would often leave during the day. He testified that at times he would walk idly around the plant and even lie on the plant floor because of the pain he was experiencing. Both Richardson and his wife stated that Richardson was often unable to get out of bed because of his level of back pain. When questioned as to what prompted his leaving his employment with Steelcase, Richardson stated that his back "got to hurting worse [and] worse and [he was] missing more days [a]nd finally [he] just couldn't take it anymore."
Unlike the employee in Gibbons, Richardson had on at least two occasions been placed in different, more sedentary positions by Steelcase in an effort to accommodate him; however, these efforts had failed. The first, a maintenance position, required Richardson only to type purchase orders, process time cards, and drive the company truck to pick up an occasional part. The evidence indicated that Richardson experienced back pain and regularly missed work during his time in the maintenance department. Steelcase next placed him in a "parts bag job," which required him only to lift a box of parts onto a table and then bag the individual parts, which weighed less than one pound each. Richardson was free to sit, stand, and walk in this position; however, the evidence indicates that he was unable to perform this job. Rather, Richardson's condition continued to deteriorate to the point that he was often unable to get out of bed to even come to work, so he voluntarily left his employment. We conclude that based on the facts of this case, Richardson was not required to continue to seek additional accommodations or another position from Steelcase when prior accommodations and placement into new positions by Steelcase had failed. The trial court could have found from the evidence presented that additional accommodations would have been futile. It is difficult to imagine an accommodation or placement into a more sedentary position than one that requires an employee merely to type purchase orders, process time cards, or bag small parts that weigh less than one pound and that permits him to sit, stand, and walk as needed.
*424 Accordingly, after reviewing the record in this case, we conclude that the trial court's finding that Richardson was physically unable to attend the jobsite and that he was unable to continue his employment with Steelcase was a "good cause [reason] connected with [his] work" for voluntarily leaving his employment with Steelcase and was supported by substantial evidence. Therefore, we affirm the trial court's granting of Richardson's petition to reopen his workers' compensation claim pursuant to § 25-5-57(a)(3)i., Ala.Code 1975.
Steelcase next argues that the trial court exceeded the relief allowed by § 25-5-57(a)(3)i., Ala.Code 1975, in finding Richardson permanently and totally disabled. Our supreme court has stated "[i]n construing acts of the Legislature, we ascertain its intent from the language used in the statute itself, if possible, as well as from the reason and necessity for the act and the goals the Legislature sought to accomplish." Bleier v. Wellington Sears Co., 757 So.2d 1163, 1168 (Ala.2000). In cases of statutory construction, this court is bound to give effect to the plain language of the statute. Gilliam v. Akzo Nobel Indus. Fibers, Inc., 710 So.2d 445 (Ala.Civ.App.1997). Additionally, the Workers' Compensation Act is to be liberally construed in order to give effect to its beneficent purpose, and all reasonable doubts are to be resolved in favor of the employee. Id.
Steelcase contends that when a trial court grants an employee's petition to reconsider his permanent partial disability pursuant to § 25-5-57(a)(3)i., Ala Code 1975, the court must limit its finding of disability to a permanent partial disability and may not find an employee permanently and totally disabled. We disagree with this interpretation of § 25-5-57(a)(3)i. Section 25-5-57(a)(3)i. clearly provides that when an injured worker returns to work at a wage greater than or equal to his or her preinjury wage, the employee's permanent partial disability is limited to his or her physical impairment and the trial court is prohibited from considering any evidence of a vocational disability. However, if the employee loses his or her job for any of the enumerated reasons set forth in § 25-5-57(a)(3)i., the employee may petition the court for a reconsideration of his or her permanent partial disability. The trial court is then permitted to assess the extent of the employee's disability using, among other things, "any evidence of vocational disability." § 25-5-57(a)(3)i., Ala.Code 1975. Further, the fact that the employee had previously returned to work before his or her loss of employment "shall not constitute a presumption of no vocational impairment." § 25-5-57(a)(3)i., Ala.Code 1975.
We note that the phrase "reconsideration of his or her permanent partial disability rating" refers to the rating determined by the trial court based on the employee's physical impairment rating, without consideration of vocational-disability evidence after the employee has returned to work at an equal or greater wage than the preinjury wage. We do not consider this phrase to be a limiting phrase that strictly limits any further finding of disability by the trial court after a finding of permanent partial disability. Second, the allowance of the trial court to consider "any evidence of vocational disability" in the reconsideration of the employee's earlier permanent partial disability rating and the fact that no presumption of no vocational disability arises where the employee had previously returned to work necessarily would permit a finding of a permanent total disability under the appropriate circumstances. Take, for example, the familiar scenario where a middle-aged employee who has no advanced education *425 or training and whose previous work history has consisted of primarily unskilled heavy labor sustains a work-related physical injury. The employee may be determined to have only a permanent partial physical disability, but, because of his work restrictions and lack of formal education or advanced training, he may be determined to be permanently and totally disabled because of his vocational disabilities. Certainly, the Legislature did not intend to deny this employee the opportunity to be found permanently and totally disabled by the trial court when he returned to work with his physical disability only to find that his condition continued to deteriorate to the point that he was no longer able to work. This court notes that § 25-5-57(a)(4)b., Ala.Code 1975, provides a mechanism for the employer to petition a trial court that awarded compensation based on a finding of a permanent total disability to alter, amend, or revise the award of compensation when the disability upon which the employee suffers is removed and is no longer a permanent total disability. Finally, nothing in § 25-5-57(a)(3)i. expressly prohibits the trial court from awarding benefits based on the finding of a permanent total disability when an employee has petitioned the court for a reconsideration of his permanent partial disability pursuant to § 25-5-57(a)(3)i.
Accordingly, we conclude that the trial court did not exceed the relief allowed by § 25-5-57(a)(3)i., Ala.Code 1975, in finding Richardson permanently and totally disabled.
Steelcase next argues that the trial court's award of permanent total disability benefits in this case is in violation of § 25-5-57(a)(4)d., Ala.Code 1975. We disagree. Section 25-5-57(a)(4)d., provides, in part: "Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled." The question whether an employee can be vocationally rehabilitated is one of fact and the weight of the evidence before the trial court is not within this court's purview. Asplundh Tree Expert Co. v. Latham, 656 So.2d 839 (Ala.Civ.App.1995).
We further note the following with regard to a finding of permanent total disability. We apply a presumption of correctness to the court's findings of fact, including its determination of disability. Where ore tenus evidence is presented to the trial court, the court's findings of fact based on that evidence are presumed correct and will not be disturbed on appeal unless they are clearly erroneous and without supporting evidence. Mutual Sav. Life Ins. Co. v. Hogue, 693 So.2d 530 (Ala.Civ.App.1997). The test for permanent total disability is the inability to perform one's trade and to find gainful employment. Michelin North America, Inc. v. Hamby, 722 So.2d 770 (Ala.Civ.App.1998). The court must apply a two-pronged test in determining whether a permanent total disability exists: the employee must be found to be incapable of returning to his trade, as well as incapable of being retrained for gainful employment. Id."Total disability does not mean an entire physical disability or absolute helplessness." 722 So.2d at 773. The court is not required to make a specific finding that an employee cannot be retrained for gainful employment, because such a finding is implicit when the trial court concludes that the employee is permanently and totally disabled. Star Rails, Inc. v. May, 709 So.2d 44 (Ala.Civ.App.1997). This court has stated "`[g]ainful employment means employment similar in remuneration to that earned prior to the injury. Implicit in this is that the gainful employment sought *426 to be restored must be "suitable." By "suitable" we mean employment which is compatible with the employee's pre-injury occupation, age, education, and aptitude.'" Trans Mart, Inc. v. Brewer, 630 So.2d 469, 471 (Ala.Civ.App.1993), quoting Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985). It is the duty of the trial court to make some determination as to the extent of disability. Hamby, 722 So.2d at 773. In making this determination, the trial court is not bound by expert testimony, but must consider all the evidence, including its own observations, and interpret that evidence to its own best judgment. Burden v. Huckaba, 708 So.2d 199 (Ala.Civ.App.1997). The court, in determining disability, may also consider the employee's subjective complaints of pain. Hamby, 722 So.2d at 773.
The trial court made the following findings of fact regarding the extent of Richardson's disability:
"[Richardson] presented a vocational expert at trial, Patsy Bramlett, who concluded that [Richardson] was one hundred (100%) percent permanently, totally disabled and is not a candidate for vocational rehabilitation. [Steelcase] also presented a vocational expert, Patsy Hanes, at trial. Having listened carefully to the conclusions and testimony of both vocational experts, the Court finds [Steelcase's] expert's opinions to be poorly founded and contradicted by other competent evidence as well as the Court's personal observations of [Richardson] during the course of the trial. In addition to the expert vocational testimony from both parties, several physicians who examined [Richardson] and testified by deposition indicated that [Richardson] was extremely disabled. Dr. Bacon, an orthopedic surgeon, who examined [Richardson] in May 1998, around the time he left his employment with [Steelcase], specifically prescribed `no work permanently-failed back syndrome' for [Richardson]. Dr. Kenneth Eldred, a chiropractic physician, who had treated [Richardson] for several years, testified that [Richardson] could not work or hold any employment position and was disabled as a result of the August 20, 1992, work-related accident and injury. In March 1998, [Richardson] even attempted a functional capacity examination. However, after the examination [Richardson] was bedridden, in severe pain, for a period of time. This evidence reveals that [Richardson] is unable to function physically on a consistent, day-to-day basis. The testimony from [Richardson] and his wife, Dawn Richardson, further also consistently revealed that [Richardson] has difficulty performing even simple tasks of everyday life due to his injury and condition."
After reviewing the record, we cannot say that the trial court's finding that Richardson is permanently and totally disabled violates § 25-5-57(a)(4)d. It does not appear from the record that Steelcase ever offered Richardson vocational rehabilitation, and, if it had, the record supports a finding that Richardson was not a candidate for vocational rehabilitation. Further, the record does not indicate that Richardson had refused a reasonable accommodation. On the contrary, Richardson had on two previous occasions accepted from Steelcase accommodated positions that the trial court found Richardson was ultimately unable to perform. The evidence presented indicated that Richardson's physical condition was such that the trial court could have found that additional accommodations would have been futile. Accordingly, we cannot say that the trial court abused its discretion in finding Richardson permanently and totally disabled.
*427 Steelcase next argues that the trial court erred in awarding Richardson benefits, because, it says, he refused suitable employment in violation of § 25-5-57(a)(3)e., Ala.Code 1975. Section 25-5-57(a)(3)e., Ala.Code 1975, provides:
"e. Effect of Refusal of Suitable Employment. If an injured employee refuses employment suitable to his or her capacity offered to or procured for him or her, he or she shall not be entitled to any compensation at any time during the continuance of the refusal, unless at any time, in the opinion of the judge of the circuit court of the county of his or her residence, the refusal is justifiable."
Again, the evidence indicates that Richardson's condition had deteriorated to the point that he could not go to the worksite. When he did go to the worksite, he would often leave early. Additionally, because of his pain, Richardson would sometimes idly walk around the worksite or even lie on the plant floor. There was substantial evidence presented from which the trial could have concluded that Richardson was not suitable for gainful employment and that his decision to leave his employment with Steelcase was justifiable.
Finally, Steelcase argues that the trial court erred in calculating Richardson's weekly compensation rate based on an average weekly wage of $740.96, because, it says, an average weekly wage of $475 had been stipulated to by the parties and used by the trial court in calculating compensation benefits in the 1996 settlement between the parties. The trial court concluded that Richardson's average weekly wage at the time of his August 1992 injury was $740.96 and that based on that average weekly wage, his compensation rate would be $493.97 per week. However, because the maximum rate allowed for compensation benefits in August 1992 was $400 per week, the trial court calculated Richardson's compensation benefits based on a rate of $400 per week rather than $493.97.
We note that the parties agreed in February 1996 that Richardson's average weekly wage at the time of the August 1992 injury was $475 per week. The settlement agreement was executed by Richardson and his attorney. Based upon the settlement agreement, the trial court adopted the agreed upon average weekly wage of $475 in calculating Richardson's award of benefits in February 1996. Accordingly, we conclude that the trial court is precluded from revisiting the issue of Richardson's average weekly wage based on the doctrines of res judicata and collateral estoppel. See Lee L. Saad Constr. Co. v. DPF Architects, P.C., 851 So.2d 507 (Ala.2002). Therefore, we must reverse the judgment as to this issue. On remand, the trial court should recalculate the workers' compensation benefits based on the agreed upon average weekly wage of $475.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and MURDOCK, J., concur.
CRAWLEY and THOMPSON, JJ., concur in the result.
PITTMAN, J., dissents.
PITTMAN, Judge, dissenting.
In contrast to the view taken by the per curiam opinion, I do not believe that this case can properly be distinguished from Gibbons v. Shaddix Pulpwood Co., 699 So.2d 225 (Ala.Civ.App.1997). In the present case, as in Gibbons, the employee voluntarily quit without notice and without first giving the employer an opportunity to move him to a job that he might have been able to perform. Also, in the present case, *428 as in Gibbons, the employee admitted that he did not discuss the possibility of moving to a different job before quitting.
Richardson testified that he quit on May 12, 1998. Richardson admitted that he did not request any type of accommodation before quitting:
"Q. [By Steelcase's attorney] Now, at the time you quit in May of 1998, you did not ask Steelcase to provide any additional accommodations; correct?
"A. No, sir.
"Q. You did not ask Steelcase to give you a different job?
"A. No, sir.
"Q. You did not ask for a job transfer?
"A. No, sir.
"Q. You did not post or apply for any other jobs?
"A. No, sir.
"Q. You did not request any modifications to the job you were performing?
"A. No, sir.
"Q. And you made no effort to continue your employment with Steelcase at the time you quit?
"A. No, sir.
"Q. And you said no, sir, to a lot of those questions. Just to make clear on the record, you didn't ask for any accommodations, you didn't ask for a different job, you didn't post for another job, you didn't seek another job; correct?
"A. That's correct."
While Richardson claims that he could not perform his job because of his lower back pain (as well as pain and numbness in his right leg), it was unreasonable for Richardson not to have inquired of the possibility of additional accommodations or a different job before taking the drastic step of quitting his job. Although Richardson missed a substantial amount of work within the two-and-a-half-month period before he quit, the record simply does not support the trial court's determination that Richardson's loss of employment was due to his "physical inability to attend the jobsite or continue his employment with [Steelcase]." While both Richardson and his wife claimed that Richardson was often unable to get out of bed because of his level of back pain and although Richardson further claimed that he could not straighten up to come to work and that his back "got to hurting worse and worse" until he "just couldn't take it anymore," Richardson also testified on cross-examination that his reason for quitting was that he could not stand on his feet for nine hours a day and could not bend and twist.
From the date of Richardson's return to work after the August 1992 injury until the day he quit, Steelcase accommodated all of Richardson's work restrictions as well as his complaints of pain. His job duties at the time he voluntarily quit included taking small parts out of boxes and putting them in bags. Richardson was permitted to sit, stand, and walk around as needed; he was not required to lift the heavy boxes of parts. Moreover, at the time Richardson voluntarily quit, no medical doctor had recommended that he resign. Even Dr. John Bacon, an orthopedic surgeon who found Richardson to be "unable to work" on May 26, 1998 (after Richardson had already quit),[2] admitted on cross-examination *429 during his deposition testimony that it would have been reasonable for Richardson to seek accommodation before quitting his job at Steelcase. Specifically, Dr. Bacon testified as follows:
"Q. [By Steelcase's attorney] Doctor, do you agree that if Mr. Richardson was having difficulty performing his work at Steelcase in May, 1998, that he should have gone to his employer so that they may have had to change or provide him an accommodation to whatever discomfort or pain he was suffering?
"....
"A. It would depend on if I knew anything of his relationship with his employer and, certainly, if he were able to go to the employer and they would make accommodations that would allow him to continue to work, then he initially should have pursued that avenue."
It is undisputed that Steelcase had accommodated all of Richardson's complaints relating to his back pain in the past. A reasonable employee under similar circumstances would have inquired about the availability of further accommodations before quitting. Richardson's failure to do so demonstrates a lack of a good-faith effort to retain his employment. In my view, Steelcase adduced clear and convincing evidence that Richardson's voluntary loss of employment, which occurred less than three weeks before the expiration of the period within which he could properly file a petition, pursuant to § 25-5-57(a)(3)i., for reconsideration of his permanent partial disability rating, was not for "good cause," whereas Richardson did not adduce substantial evidence to the contrary. I would reverse the judgment of the trial court in its entirety and remand for the entry of a judgment denying Richardson's petition; I therefore respectfully dissent.
NOTES
[1] "Clear and convincing evidence" is defined under § 25-5-81(c), Ala Code 1975, as:

"[E]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
[2] The record reveals that although Dr. Bacon noted on a prescription slip (dated May 26, 1998) "no work permanently  failed back syndrome," approximately one year later, he assigned Richardson the following work restrictions:

"[N]o bending, lifting less than ten pounds, no standing or walking, for more than two hours a day, no sitting for more than two hours in a work day. He should not sit for more than fifteen minutes at a time without being able to stand and move around. He should not twist, bend from the waist or ride in a car for long distances."
Dr. Bacon testified that Richardson could perform work within those restrictions.